[Civ. No. 13886. Third Dist. June 5, 1973.]

COUNTY OF INYO, Plaintiff and Appellant, v.
SAM YORTY, as Mayor, etc., et al., Defendants and Respondents.

## COUNSEL

Frank H. Fowles, District Attorney, and L. H. Bray, Deputy District Attorney, for Plaintiff and Appellant.

Fredric P. Sutherland, Brent N. Rushforth, Carlyle W. Hall, Jr., Mary D. Nichols, John R. Phillips, Ralph Winter and Richard E. Gutting, Jr., as Amici Curiae on behalf of Plaintiff and Appellant.

Roger Arnebergh, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, Kenneth W. Downey, Assistant City Attorney, and Gilbert W. Lee, Deputy City Attorney, for Defendants and Respondents.

## OPINION

**RICHARDSON, P. J.**—Petitioner (hereinafter "County") sought a writ of supersedeas which we treated as a petition for writ of mandate, and thereupon issued an alternative writ. Respondents filed appropriate reply to the petition and have also in the trial court interposed their demurrer and answer.

These proceedings follow the filing of a complaint by County in the County of Inyo against respondent City of Los Angeles, a municipal corporation, its department of water and power, the president and secretary of the department and commission, its chief engineer who is also

general manager, and Does 1 through 20 (all hereinafter "City"). The complaint sought a temporary restraining order, preliminary injunction and permanent injunction to halt the extraction of subsurface waters from the Owens Valley in Inyo County until the filing by defendants of an Environmental Impact Report (hereinafter "EIR") required by the California Environmental Quality Act of 1970 (hereinafter "CEQA"), and a determination of the environmental effect of the continued and expanded extraction of subsurface water. A temporary restraining order was issued by the Inyo County Superior Court limiting any increase in the withdrawal of water in the affected area.

Subsequently, a motion by City for change of venue from Inyo to Sacramento County was granted. A hearing was held in Sacramento County Superior Court which resulted in denial of the application for preliminary injunction and dissolution of the temporary restraining order, from which action the present petition stems. County has also filed notice of appeal.

County generally asserts "error by the trial court in application of the Environmental Quality Act to the respondents' activities within petitioner's county." More specifically, County alleges: (1) The order dissolving the temporary restraining order is an appealable order but to await the formal resolution of the appeal, with its attendant delays, will render the substantial questions of law moot in that irreversible environmental damage will have resulted. (2) The trial court erred in its determination that CEQA did not apply to City's activities because of its view that such action was a continuation of a pre-existing activity or project born before the effective date of CEQA.

Narrowly stated, the issue before us is whether City is required to file an EIR with reference to its continued extraction of subsurface waters from the Owens Valley area of County.

Resolution of this issue and an evaluation of the conflicting legal and factual considerations bearing on it require a brief review of the geography of the area and of the history and character of the pertinent relationships between the two public entities involved.

The Owens Valley is located in east central California along the eastern edge of the Sierra Nevada Mountains, and runs in a general north and south direction through Mono and Inyo Counties. The valley is approximately 120 miles in length and from 15 to 30 miles wide, comprising a total area exceeding 3,000 square miles, approximately the size of Belgium. The valley's elevation varies from 3,500 feet to more than 10,000 feet. It is semi-arid but receives in the late spring and early summer, from both the

Sierra Nevada on the west and the Inyo and White Mountains on the east, substantial but varying flows of surface water from the melting snowfields. It lies in an area contiguous to and immediately south of Mono County recently described by the Supreme Court in the following manner: "[N]ature's bountiful gifts of majestic mountains, lakes, streams, trees and wildlife have produced in the area one of the nation's most spectacularly beautiful and comparatively unspoiled treasures." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 253 [104 Cal.Rptr. 761, 502 P.2d 1049].) The Owens River is the principal drainage course in the basin, flowing in a parallel north-south axis along the westerly side of the Valley and into Owens Lake which has no natural outlet.

City, faced with the necessity of importing water to serve the needs of a growing metropolitan population in the Los Angeles Basin, began the systematic acquisition of water rights and land in the Owens Valley shortly after 1900. These acquisitions were made for the purpose of acquiring control of the water supply in the area, and at the present time City owns approximately 300,000 acres in Inyo and Mono Counties, comprising roughly 97 percent of the available privately held land. Between the years 1908 and 1913 City constructed a surface aqueduct (the "first aqueduct") between the Owens Valley and City and began receiving Owens Valley water in 1913.

In 1941 City completed what is known as the "Mono Basin Project." This project was designed to gather the natural runoff in the Mono Basin area and to direct it by gravity flow and pumping operations through the Mono Lake watershed into the Owens River system through the Tinemaha Reservoir to the Haiwee Reservoir. The project is a complex of sources, tributaries, conduits, tunnels and storage areas extending 349 miles from Lee Vining to Los Angeles. At a relatively early date, as an auxiliary to the natural precipitation in the area, City commenced the drilling of a large number of wells to tap the subsurface pools of underground water in Owens Valley. These wells were heavily used during dry years to assure, as a supplementary source, a continuous and adequate flow through the first aqueduct. Since 1917 City has drilled more than 360 wells, of which it has pumped 190. Seven of them have been placed in operation since November 1970. Of more significance, as noted below, is the recent great acceleration of pumping operations from existing wells. Further, of the 11 wells drilled since 1963, seven were pumped for public use for the first time and a number of older wells had their capacity increased after the effective date of CEQA.

By 1963 City, prompted by the increasing water needs of a continued

rapidly expanding population, had caused the preparation of a long-term report entitled "Availability and Utilization of Inyo-Mono Water" ("Report"). The Report noted that as of 1963 there had been 21 separate water rights filings by the State of California on streams and lakes in Inyo and Mono Counties for the purpose of providing domestic and recreational uses of water. The Report further indicated the growing and competing interests in Owens Valley water among various public entities and the increasing challenge to the City's beneficial utilization of it. It noted that in 1934 City had filed on 200 cubic feet per second (cfs) of water in the Mono Basin, but the first aqueduct was not of sufficient capacity to carry all such water to City. According to the Report, City had proposed in 1959 the construction of a second aqueduct to carry water from Owens Valley to the City for the purpose of completing "the development of our Inyo-Mono supply that began over fifty years ago" and to insure that City would not lose certain water rights on which it had filed primarily in the Mono Basin development.

Historically, the first aqueduct conveyed most of the available surface runoff from Owens Valley. It was planned that the second aqueduct would be filled largely from three sources: increased surface diversion from Mono Basin, reduced irrigation of City-owned lands in the affected counties and increased pumping of groundwater reservoirs in Owens Valley.

The cost of the second aqueduct was approximately $91,000,000 of which 96 percent had been expended when the operation of the aqueduct commenced in 1970. Of the approximately $2,000,000 appropriated for construction of additional wells for increased groundwater extraction about 50 percent had been expended prior to the commencement of litigation.

Both the projection and actual utilization of groundwater extraction from Mono and Inyo Counties have steadily increased in the past 40 years. Some understanding of the measure and rapidly increasing tempo at which the groundwater reservoirs have been tapped may be gained from the fact that during 1972 four new wells were constructed in the Independence Well Field alone, having an aggregate present pumping capacity exceeding 40 cfs, and in the same field during 1971-1972 the pumping capacity of existing wells was measurably increased. It appears that using as a base the 35-year period from 1930 to 1965 a long-term average of 10.3 cfs was extracted from the Owens Valley subsurface pools. In 1963 the estimated long-term average groundwater extraction was 89 cfs. This has increased to a present pumping capacity of 240 cfs. City envisions a proposed ultimate pumping capability of 485 cfs. This would result in an

average long-term groundwater extraction of 147 cfs. This continual upward revision of pumping capacity and long-term average extraction was directed to the constant outflow of 666 cfs—the design capacity of the two aqueducts.

The parties substantially disagree on the environmental impact, if any, of this major increase. City, while accepting the possibility of moderate falls in the water table in the affected area, considers this a seasonal and cyclical effect only, manifesting itself to a measurable degree only in excessively dry years. City in its answer to the petition for writ of mandate denied that "any irreparable harm and damage will result to the environment of Inyo County by reason of Respondents' pumping operations and . . . [asserted] that the alleged harm to the environment of Inyo County, if any, is a result of an Act of God, to wit, two consecutive drought years."

County, on the other hand, insists that a series of detrimental effects upon the environment necessarily must follow City's continued implementation of the groundwater management policy. It submits an "Evaluation" prepared by its engineering staff describing such effects in the following language: "The implementation of the Department of Water and Power's groundwater management plan will reduce the available water to natural plants and wildlife habitat, with the exception of minor selected areas, to such an extent as to effectively change the natural environment of the Owens Valley. Over a longer period of time, the 'safe yield,' if there is such a quantity, will be consistently exceeded and a permanent decreasing water table will result. The benefits to the people of the Owens Valley from the pumping is negligible." Further, the "Evaluation" states "The initial program of lowering the water table to eliminate the losses due to evapotranspiration would also eliminate a large portion of our local natural vegetation which fall into the phreatophyte classification. Many of these types of plants (willows, saltgrass, tules, cattails, cottonwoods) require a water table or capillary fringe of not deeper than 10 feet. A continuing decline of the water table would eventually eliminate sagebrush, rabbit brush, and bitter brush, which make up the remainder of our natural vegetation.

"Eventually, only the selected environmental areas and the areas adjacent to water courses would be able to sustain the natural vegetation of the valley.

"Bird migration—With the drop in the water table, historical ponds and areas of surface water will be eliminated, thus eliminating feed and resting areas for water fowl population.

"Local animal population—With the reduction of vegetation and available water, bird and animal populations will also diminish."

Although the narrow central issue presented is whether City's subsurface extraction of water requires the filing of an EIR, a number of component elements may be severally stated as follows: (1) Is City's ground water management program, i.e., its increased groundwater extraction, a "project" within the meaning of CEQA, and, if so, is it an "ongoing project" within the definition established by the Guidelines for Implementation of CEQA adopted by the Secretary of the Resources Agency? In short, is CEQA applicable? (2) As to the EIR, who are its authors and recipients, and what is its effect? (3) Is County barred in these proceedings by either a statute of limitations or the doctrine of laches?

We consider the stated elements sequentially.

## The Applicability of CEQA

In response to a general and growing awareness and acceptance of the importance of the natural environment in the lives of its citizens, and the vital necessity of its protection and preservation, the Legislature enacted the Environmental Quality Act of 1970. (Pub. Resources Code, § 21000 et seq.[1]) CEQA has been described by the Supreme Court as "a milestone in the campaign for 'maintenance of a quality environment for the people of this state now and in the future . . . .' " (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 252.) Its preamble (§§ 21000 and 21001) contains a broad expression of legislative policy and recognition that the maintenance of a quality environment, present and prospective, "is a matter of statewide concern"; that "[i]t is necessary to provide a high-quality environment that at all times is healthful and pleasing . . ."; that "[t]he capacity of the environment is limited . . ."; and it is the legislative intent and policy to "take immediate steps to identify any critical thresholds for the health and safety of the people . . . ," to "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state," and to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." To that end the Act adopted a comprehensive plan requiring, among other things, that state and local agencies follow a broad program of governmental action designed to assure that in both the planning and construction phases of "man's activities" primary consideration be given to the effect of such activities on man's environment. In *Mammoth* these requirements were construed to cover the private sector as well. Among CEQA's require-

---

[1] All code references are to the Public Resources Code unless otherwise noted.

ments are those contained in Public Resources Code section 21151, providing that "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment." Such a report is required to contain a detailed description of any adverse environmental impact and effect of the proposed action, together with any alternative and minimum options available. (§ 21100.)

CEQA received substantial and clarifying amendment in 1972 by the adoption, as an urgency measure, of AB 889, which was responsive to the *Friends of Mammoth* decision cited above. As contemplated by CEQA, certain "Guidelines for Implementation of the California Environmental Quality Act of 1970" ("Guidelines") were issued in 1973 by the Secretary of the California Resources Agency for the purpose of providing "public agencies with principles, objectives, criteria, and definitions . . . to be used in the implementation of" CEQA. These Guidelines consider and define "ongoing projects," in terms pertinent to our consideration, as activities instituted but not completed prior to the effective date of CEQA. It has been suggested that California has a "three-tier system"—The Act, the Guidelines and local regulations, of which the first two are uniformly applied and to which the third must conform under section 21082. (See Seneker, *The Legislative Response to Friends of Mammoth* (1973) 48 State Bar J. 127.) In ascertaining whether City's activities constitute a "project" and an "ongoing project," we scrutinize the Act, the Guidelines and helpful interpretive decisions.

CEQA in section 21065 defines a project as "(a) Activities directly undertaken by any public agency." The Guidelines (§ 15037) read in pertinent part: (a) *Project* means the whole of an action, resulting in physical impact on the environment, directly or ultimately, that is any of the following:

"(1) an activity directly undertaken by any public agency including but not limited to public works construction and related activities, clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption of local General Plans or elements thereof."

The Supreme Court in *Mammoth, supra* (8 Cal.3d at p. 259) faced the definitional problem of "project," albeit in connection with a determination whether a privately funded activity requiring a public permit was a "project" within the meaning of CEQA, and used the following significant language: "In resolving the conflict on intent, as we must, we conclude

that the Legislature intended the EQA to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." The court continued: "As noted previously, the EQA does not attempt to define 'project.' Because the legislative intent provisions dictate that we give a broad interpretation to the act's operative language, we begin from that vantage point. Once a particular legislative intent has been ascertained, it must be given effect ' "even though it may not be consistent with the strict letter of the statute." ' [Citation.] As we stated nearly a half century ago in *In re Haines* (1925) 195 Cal. 605, 613 [234 .P. 883]: ' "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." ' "

After concluding that dictionary definitions were of no assistance to the task before it, the Supreme Court in *Friends of Mammoth* v. *Board of Supervisors, supra,* at page 260, resorted to the rule which it had declared in *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790]: "A principle 'which must be applied in analyzing the legislative usage of the word "project," is that "the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is enlarged or restricted and especially in order to avoid absurdity or to prevent injustice." ' "

It is, therefore, apparent that the ascertainment of the intent of the Legislature in enacting CEQA is vital in the search for a meaningful definition of "project" within this context. The stated policy and intent of the Legislature, clearly expressed in sections 21000 and 21001, to which we have previously adverted, direct that highest priority shall be given to environmental considerations.

County has asserted a catalogue of harmful environmental effects arising from the present and proposed increased groundwater pumping of the Owens Valley underground reservoir, some of which are summarized above. It describes these effects in its "Evaluation" prepared by and attached to the declaration of Ronald Redmond, employed by County's engineering department to study the effects of implementation of City's groundwater management plan. County supports its contentions by referring

to certain challenges by the California Department of Water Resources to the techniques and conclusions of City's report on Water Resources Management Plan. It also supports its claims with a series of declarations by residents of Inyo County which, taken together, indicate a general drying of the natural streams and consequent damage to vegetation, foliage and wildlife in the affected area. Under the legislative mandate above expressed, while we need not accept the foregoing as factually established, neither can we ignore the allegations or implications to the environment necessarily flowing therefrom.

City urges strongly that its groundwater extraction program, involving as it does the utilization and pumping of the underground pools in question for purposes of filling the second aqueduct authorized, constructed and operative before the advent of CEQA, and that the second aqueduct and underground pumping are a single, integrated operation and thereby exempt from application of CEQA.

If the two activities are severable, we are thus presented with an issue of somewhat broader implication, namely, since the pumping admittedly has been expanded and accelerated after the effective date of CEQA, to what extent, generally, does CEQA have application to projects commenced before but not completed until after its effective date? This is a problem of first impression in California, and we find guidance in its solution from two principal sources: (1) the Guidelines promulgated February 3, 1973, by the secretary for California Resources Agency to "implement, interpret, or make specific" CEQA, and (2) certain federal cases interpreting the National Environmental Policy Act (42 U.S.C. §§ 4321-4347) (hereinafter "NEPA").

The issue is treated in section 15070 of the Guidelines, denominated "Ongoing Project," as follows:

"(a) A project covered by Section 15037(a)(1) definition of project specified by these Guidelines, approved prior to November 23, 1970, shall not require an Environmental Impact Report or a Negative Declaration— unless it is a project which may have a significant effect on the environment, and

"(1) A substantial portion of public funds allocated for the project have not been spent and it is still feasible to modify the project in such a way as to mitigate against potentially adverse environmental effects, or to choose feasible alternatives to the project, including the alternative of 'no project' or halting the project; or

"(2) The responsible agency proposes a modification to the project

plan, such that the project might have a new significant effect on the environment."

Bearing in mind the foregoing definition of "project" appearing in section 15037, subdivision (a)(1), of the Guidelines, we observe that while it is true that the second aqueduct was planned, constructed and utilized before the effective date of CEQA, the following are equally true: (1) The water to be used in the second aqueduct has three principal sources—increased surface diversions from Mono Basin, decreased spreading and irrigation of City-owned land in Mono and Inyo Counties, and increased pumping of groundwater reservoirs in the Owens Valley. Further, both aqueducts draw from the Haiwee Reservoir at the southern extremity of the Mono Basin Development which is filled with water drawn from those sources. (2) The second aqueduct can be, and has been, filled entirely by surface runoff from Owens Valley only, without the utilization of any subsurface extraction whatever. (3) While the capacity of both aqueducts was known and presumably fixed irrevocably from the period of planning and design onward (666 cfs), the actual extraction of subsurface water has steadily increased from a long-term average 10.3 cfs during the 35-year period 1935 to 1969, to an estimated 89 cfs in 1963, to an existing capacity of 248 cfs in 1971, to an ultimate capacity of 415 cfs estimated in 1971, to an ultimate pumping capacity of 485 cfs estimated in October 1972. In short, while the capacity of the second aqueduct was fixed and known for a number of years before CEQA, the effect of its construction on subsurface water extraction has been a variable but steady escalation, dependent in large part, no doubt, upon the extent of seasonal rain and snowfall from year to year. Thus the ecological impact of the second aqueduct, viewed in conjunction with the underground pumping and measured by the quantity of extraction, has not been fixed but has substantially increased in severity in the period before, during and after its construction. (4) As of the present time, although approximately 95 percent of the estimated cost of construction of the second aqueduct has been expended, only 50 percent of the estimated cost of construction of additional wells to bring the subsurface extraction to its full projected capacity has been spent.

We conclude from the foregoing that the legislative intent so strongly expressed in CEQA can be met only by considering the expanded ground-water extraction as a "project" separate and divisible from the second aqueduct, and we so treat it.

With reference to the groundwater extraction project, we note that as of the present time approximately half of the moneys appropriated for

well drilling and pumping have been expended, and of this sum a substantial amount has been spent since the effective date of CEQA. We further note that the "project" to date has involved a continued "modification" in the constantly increased intensity and scope of actual and projected groundwater withdrawals. We have before us clear evidence that continuance of the subsurface extractions "might have a new significant effect on the environment." Inescapable, in our view, is the conclusion that under either subsection of section 15070 of the Guidelines an EIR is required.

The Supreme Court in *Friends of Mammoth, supra,* has pointed to the identity of purpose of NEPA and CEQA and utilized federal court rulings in reaching its conclusions, using the following language (8 Cal.3d at pp. 260-261): "Not only . . . [do] the timing and the titles of the two acts tend to indicate that the EQA was patterned on the federal act, the key provision of the two acts, the environmental impact report, is the same. (Compare 42 U.S.C. § 4332, subd. (2)(C) with Pub. Resources Code, § 21100; see also Pub. Resources Code, §§ 21101, 21102, 21105, 21150, 21151.) Indeed, much of the phraseology of the EQA is either adopted verbatim from or is clearly patterned upon the federal act. As one commentator has observed, the EQA is 'much like the Federal NEPA.' (Powell, *The Courts as Protectors of the Environment* (1972) 47 L.A. Bar Bull. 215, 218.)

"Accordingly, in construing 'project' in the EQA, the definition of that word in the federal act and regulations becomes relevant. It is significant to note, in this regard, the Court of Appeals for the District of Columbia has emphasized that in construing the federal act the judicial role is active and that the NEPA must be interpreted broadly. (See *Calvert Cliffs' Coord. Com.* v. *United States A. E. Com'n., supra,* 449 F.2d 1109, 1111.) This is consonant with the mandate of the California Legislature that the EQA be given a liberal construction."

In interpreting NEPA several federal cases have applied the requirement of an environmental impact statement (identical to an EIR) to projects which although planned and commenced had reached a point of varying completion. (*Arlington Coalition on Transportation* v. *Volpe* (4th Cir. 1972) 458 F.2d 1323, highway construction, with completion of roughly 80 percent of property acquisitions, and 80 percent of acquisition moneys expended; *Keith* v. *Volpe* (1972) 4 ERC 1562, highway construction, $100,000,000 expended; *Morningside-Lenox Park Association* v. *Volpe* (N.D.Ga. 1971) 334 F.Supp. 132, highway construction, "substantial actions" yet to be taken; *Environmental Defense Fund* v. *Corps of Eng. of U. S. Army* (E.D.Ark. 1971) 325 F.Supp. 749, dam construction, approximately 65 percent completed.)

No single standard can be gleaned from the federal cases on the issue of the point in time or the degree of completion at which, in the language of *Arlington, supra* (at p. 1331), "the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom that it might no longer be 'possible' to change the project . . . ." The *Arlington* court, referring to NEPA, continues: "The congressional command that the Act be complied with 'to the fullest extent possible' means, we believe, that an ongoing project was intended to be subject to Section 102 until it has reached that stage of completion, and that doubt about whether the critical stage has been reached must be resolved in favor of applicability." We have no doubt that the project of underground-water extraction herein presented has not reached such point of effective and practical economic or ecological finality as to render meaningless any enforcement of CEQA.

It follows, accordingly, that City's expanded tapping and extraction of the underground water is an "ongoing project," requiring an EIR within the contemplation of section 15070 of the Guidelines. We think such a conclusion is consistent with the letter and spirit of the legislative purpose strongly asserted and variously expressed in CEQA.

## THE REPORT

██ Concluding, as we do, that CEQA is applicable to the project in question, we review the nature of the EIR and inquire to whom it is directed, its effect and its purpose.

We consider the pertinent language of several key sections of CEQA in determining the character of EIR. It is defined in section 21061 as "an informational document," whose purpose "is to provide public agencies with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which any adverse effects of such a project might be minimized; and to suggest alternatives to such a project."

Section 21100 requires that an environmental impact report shall contain the following: "(a) The environmental impact of the proposed action. (b) Any adverse environmental effects which cannot be avoided if the proposal is implemented. (c) Mitigation measures proposed to minimize the impact. (d) Alternatives to the proposed action. (e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity. (f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented. (g) The growth-inducing impact of the proposed action."

Section 21104 mandates the responsible state agency to consult with public agencies having jurisdiction by law with respect to the project. The section further states that the responsible state agency "may consult with any person who has special expertise with respect to any environmental impact involved." Section 21153 applies similarly to local agencies. Section 15012 of the Guidelines describes the effect of the EIR as a means of informing public decision makers and the general public of the environmental byproducts of anticipated projects, and indicates in the following language the weight of force to be given to it: "The EIR process is intended to enable public agencies to evaluate a project to determine whether it may have a significant effect on the environment, examine and institute methods of reducing adverse impacts, and consider alternatives to the project as proposed. . . . An EIR may not be used as an instrument to rationalize approval of a project, nor do indications of adverse impact, as enunciated in an EIR, require that a project be disapproved—public agencies retain existing authority to balance environmental objectives with economic and social objectives."

Section 21151 contains the critical language in the following form: "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of the environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment. When a report is required by Section 65402 of the Government Code, the environmental impact report may be submitted as a part of that report."

It is therefore apparent the law requires a local agency to prepare an EIR when two conditions are satisfied: (1) It is carrying out a "project," and (2) the project may have a significant effect on the environment. In the case before us, as we have indicated, the expanded groundwater extraction program is a project within the meaning of the Act. In our view, the second criterion is met by the presence of some substantial evidence that the project "may have a significant effect" environmentally.

The necessity for knowledge of the contemplated action of an agency is treated in section 21152, which provides: "Whenever a local agency approves or determines to carry out a project which is subject to the provisions of this division, it shall file notice of such approval or such determination with the county clerk of the county, or counties, in which the project will be located. Such notice shall indicate the determination of the local agency whether the project will, or will not, have a significant effect on the environment and shall indicate whether an environmental impact report has been prepared pursuant to the provisions of this division."

Several authoritative expressions indicate the purpose of EIR and the manner in which it is to be prepared. The Supreme Court in *Friends of Mammoth, supra,* has indicated: "The impact report must be specially prepared in written form before the governmental entity makes its decision. This will give members of the public and other concerned parties an opportunity to provide input both in the making of the report and in the ultimate governmental decision based, in part, on that report." (8 Cal.3d at p. 263, fn. 8.) In this connection the paramount facts to be considered in preparation of EIR have recently been voiced by the appellate court in *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.,* 27 Cal.App.3d 695, 704-705 [104 Cal.Rptr. 197], as follows: "The preparation of the EIR demands thoughtful consideration of public interests transcending such necessary elements as always have been present, e.g., engineering and economic feasibility. Those who prepare the EIR may not limit their vision by the boundaries of the district, nor by purely physical auxiliaries or obstacles to a project's success which may be found beyond the borders. Moreover, the planning agency by criticism and adverse comment may persuade the directors of a district to revise an EIR. Revision of a project itself, or even abandonment, may follow, not by the use of any authority of the planning commission which is not given by the act, but by reason of thoughtful reconsideration.

"But the EIR has another function: the informing of the executive and legislative branches of government, state and local, and of the general public of the effect of the project on that revered resource which we call 'The Environment.' Obviously, the impact often must be deleterious to some extent to virgin land, to air, to beauty of unspoiled places because of the needs of the times. But the EIR must fulfill the role of disclosure of qualified estimations of the best way, all things considered, of meeting the demands of the present while preserving and, if possible, enlarging an ample inheritance for the future."

It is apparent from a review of the foregoing sections and the interpreting decisions that the Legislature in CEQA has enacted a logical and carefully devised program of wide application and broad public purpose. In many respects the EIR is the heart of CEQA. The report referred to in the sections may be viewed as an environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.

CEQA provides no answer, however, to the question, with whom is EIR filed? Although City is required under section 21152 to file with

County a "notice" of its approval of a project subject to its provisions, which notice must indicate the existence of any significant environmental effects and whether an EIR has been prepared, there is no statutory requirement that City file its EIR with County. Yet County is the site of the project, the area in which the ecological damage, if any, will occur, and in which reside those citizens most directly concerned by any such adverse effect upon the environment. The answer to the question posed is suggested by the above cited language from *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra* (27 Cal.App.3d at p. 704) that "Those who prepare the EIR may not limit their vision by the boundaries of the district, nor by purely physical auxiliaries or obstacles to a project's success which may be found beyond the borders." Furthermore, such a requirement of filing with the planning agency of the affected county is binding upon state agencies (Guidelines, § 15085, subds. (c) and (h), Pub. Resources Code, § 21105), and we observe no reasons of policy requiring a different or lesser performance by a local agency.

Pertinent sections of the Guidelines also suggest certain objectives to be followed by the public agency in preparation of its EIR. Section 15161, for example, insures that public agencies receive adequate comment on their EIR's. Section 15164 provides for public participation as follows: "[I]t is a widely accepted desirable goal of this process to encourage public participation. All public agencies adopting implementation procedures in response to these Guidelines should make provisions in their procedures for wide public involvement, formal and informal, consistent with their existing activities and procedures, in order to properly receive and evaluate public reactions, adverse and favorable, based on environmental issues."

The foregoing directives suggest the importance of the widest possible local participation in the public decision making process by those authorities charged with the administration of the project. This will be most readily assured by the filing of a copy of the EIR in the particular locality most adversely affected by the project. We think the clear objectives of CEQA, in a case where, as here, the agency required to file is outside of the county most affected, can be met only if the filings of EIR include the planning agencies of the county or counties where the project is to be constructed and where significant ecological impact may occur.

### THE STATUTE OF LIMITATIONS

City asserts as an additional defense section 21167, subdivision (a), of the Public Resources Code, establishing a 180-day period from

approval or commencement of a project within which an action or proceeding may be filed alleging that a public agency is carrying out or has approved a project having a significant environmental effect without a report and determination whether such effect exists. Subdivisions (b) and (c) of section 21167 impose 30-day time limitations, running from the filing of notice, on actions alleging either an improper determination whether a project may have a significant environmental effect or that the EIR does not comply with CEQA. These amending statutes were enacted in 1972, becoming effective December 5, 1972. The present action was filed on November 15, 1972, preceding the effective date of the statutes.

We note that the Legislature by these amendments specifically validated projects which, under section 21065, subdivision (c) (involving issuance of a lease, permit, license, certificate or other entitlement for use by one or more public agencies) were "undertaken, carried out or approved" by private agencies on or before the effective date of the section. (§ 21169.) It adopted no similar "saving" clause as to projects carried out by public agencies. (§ 21065, subd. (a).) Furthermore, by section 21170, subdivision (a), the amendatory statutes are expressly inapplicable to proceedings pending and undetermined on the effective date of the section.

Accordingly, we conclude that the 1972 legislation contains no express intent to protect solely public agency projects, as defined in section 21065, subdivision (a), from the application of CEQA. The limitation periods of section 21167 are not applicable to actions of the character herein presented which were filed and pending before the effective date of section 21167.

## LACHES

■ City predicates its defense of laches upon the theory that the second aqueduct and the groundwater extraction were and are a single, identical project and that County had been aware since 1968 of City's intention to withdraw groundwater, yet took no affirmative action relative to it until 1972.

In addition to our conclusion that the two activities are severable, we are persuaded to the contrary view by the following:

(1) There is a general public policy in requiring public officials to obey statutes. (*Environmental Defense Fund* v. *TVA* (1972) 4 ERC 1850, 1861; *City of New York* v. *United States,* 337 F.Supp. 150, 160.)

(2) Laches is available as a defense to an action brought by a public entity (*City of Los Angeles* v. *County of Los Angeles* (1937) 9 Cal.2d 624,

630 [72 P.2d 138, 113 A.L.R. 370].) Indeed the Supreme Court has recognized the possible defense of laches in the application of the very act in question. (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 272.) In the circumstances before us, however, contrary to those usually presented wherein the application of laches is sought, there has been no showing of prejudice to the City by whatever delay has been occasioned. Such a disadvantage or prejudice must be present to establish laches. (*Newport* v. *Hatton* (1924) 195 Cal. 132 [231 P. 987]; *Environmental Defense Fund* v. *TVA, supra,* 4 ERC at p. 1861.)

(3) The parties before us are both public entities in litigation involving issues as to which the Legislature has declared, as previously noted, a clear and all encompassing public interest. In *Arlington Coalition on Transportation, supra* (458 F.2d 1323), the court had before it the application of NEPA relative to a freeway far advanced in its planning stages, with most of the acquisition costs expended. NEPA became effective January 1, 1970, and the action involving its requirement of an impact report was filed February 19, 1971. Defendants urged laches as a defense, but the federal court rejected such contention, using the following language: "Nevertheless, we decline to invoke laches against appellants because of the public interest status accorded ecology preservation by the Congress. We believe that [the freeway] has not progressed to the point where the costs of altering or abandoning the proposed route would *certainly* outweigh the benefits that might accrue therefrom to the general public. In their reconsideration of the proposed route, the Secretary of Transportation and the Commissioner of the Virginia Department of Highways may decide, of course, that the costs do outweigh the benefits. If the opposite conclusion is a reasonable possibility, however, as it is here, the congressional declaration of policy in the relevant statutes of the importance of the benefits that might accrue demands that the merits of the question be considered by the appropriate agencies." (Pp. 1329-1330.) We find no less strong the explicit legislative expression of public interest in CEQA. The expenditures for the groundwater extraction project approximate only 50 percent of the total planned appropriation for that purpose, and of this a substantial amount, doubtless, was for construction undertaken after the effective date of CEQA.

(4) We also note a vast disparity in the population, staff, budget and research and planning resources available to the two entities before us, which, while not controlling in itself, may be considered by us as one factor in viewing an equitable defense such as laches. There is evidence that County acted with reasonable dispatch once it possessed the report prepared by City's engineers relating to the effect of City's extraction

project, and when it had been able to assemble, collate and evaluate its own staff findings on the environmental effect of the augmented pumping. We therefore reject the defense of laches as a bar to County's action.

## CONCLUSION

The very uncertainty created by the conflicting assertions made by the parties as to the environmental effect of City's expanded groundwater extraction underscores the necessity of the EIR to substitute some degree of factual certainty for tentative opinion and speculation. Where local agency activities "may have" a significant adverse effect on the environment, CEQA contemplates a sequence of formal governmental actions, commencing with an EIR. Such report presumably will stimulate public interest and discussion and the contribution and observations of interested persons and groups, both expert and lay. The major product thereof will be a careful weighing and balancing of all factors by the appropriate public officials. The bases for this process will be the EIR and the opportunity afforded for reasoned discussion. "[M]ajor consideration [will be] given to preventing environmental damage." (§ 21000, subd. (g).) The hoped for result of this process will be a considered policy judgment.

We conclude that City's underground-water extraction constitutes a project within the meaning of CEQA and the filing of an Environmental Impact Report is accordingly required. Public agencies must undertake a searching scrutiny of their action with the long term protection of the environment as the guiding criterion. In response to the legislative mandate, they must now, for the purpose of applying such criterion, pause, even though belatedly, to focus their attention upon and give primacy to ecological considerations. Only if such careful and balanced review precedes their action can they assure that the inheritance of nature from man's yesterday is not subjected to the unintended abuse of today to the irreversible loss of tomorrow.

## THE STAY ORDER

The formulation of an appropriate stay order in this matter presents problems of considerable difficulty. We are mindful, on the one hand, of the continued responsibility heavily resting upon City in assuring the continued and adequate flow of water, through fluctuating annual and seasonal changes of precipitation, to a major population center from an area presently furnishing 80 percent of its water. We are also sensitive to the legislative expression, above alluded to, indicating the public policy of this state to "[e]nsure that the long-term protection of the environment

shall be the *guiding criterion* in *public decisions*" (§ 21001, subd. (d)) and to "[r]equire governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality" (§ 21001, subd. (f)). (Italics added.) We have thus a classic confrontation of two competing public entities, each asserting legitimate but conflicting public interests. Furthermore, we are fully aware of the limitations on this court in terms of both its accessibility to the parties and its ability to supervise and "police" its orders in this connection and to conduct evidentiary hearings thereon.

We cannot speculate on the probable duration of time required in the preparation of the EIR and those procedural steps necessary to the formulation of a responsible and considered judgment in the light of the EIR. We envision the probable need for further evidentiary hearing on the nature and extent of the environmental impact occasioned by City's activities, and other related matters not presently foreseeable. For this purpose the trial court is particularly suited and equipped, and to that end we enlist its aid. We will direct the preparation and certification by City of an EIR in accordance with Public Resources Code section 21151 and will direct also the prompt filing of a copy thereof with the planning agency of Inyo County.

Meanwhile, the augmented and expanded pumping continues, and we are told that observable ecological damage is being sustained daily. County, while not asking for a cessation of Owens Valley groundwater extraction, seeks, pending the filing of an EIR, a limit to the pumping fixed by the quantity of subsurface water extracted November 23, 1970, the effective date of CEQA. A possible alternative is to fix the limit of the amount of the subsurface draw by averaging it over a period of years. Two difficulties inhere in the "averaging" approach. The expanded pumping for the second aqueduct has continued only since 1970, with the result that a mere three-year average is available. Furthermore, in the "averaging" there may be an excess of wet years when the subsurface draw was low or dry years when the extraction was high. Although we recognize that in either formula, the arbitrary selection of a year or the averaging method, standing alone, may create unfairness, we elect to utilize elements of both.

Forthwith and in aid of this court's original jurisdiction to issue its writ of mandate, we stay further extraction of underground water from the Owens Valley Ground Water Basins in excess of the average being taken on November 23, 1970, pending a determination by the trial court of that figure which is found to be the mean or average of the extraction during the years of highest and lowest precipitation from July 1, 1970, to date. When such latter

figure is ascertained, it will be fixed as the maximum allowable withdrawal from the subsurface pool in Owens Valley Ground Water Basins until the filing of an EIR and appropriate action thereon as provided by law. City is directed to modify its extraction in accordance with the stay outlined above. City is further directed to proceed with the preparation and filing of an EIR in accordance with the views herein expressed. The trial court is directed, to the extent necessary or appropriate, to supervise compliance with the Act.

Let a writ of mandate issue, directing City to prepare, certify and file in accordance with law an EIR, and further directing City, pending such preparation, certification and filing to limit forthwith its underground-water extraction in the affected area to the level and for the period hereinabove described.

Friedman, J., and Janes, J., concurred.

On June 29, 1973, the opinion was modified to read as printed above.