[Civ. No. 44515. Second Dist., Div. Two. May 19, 1975.]

MARY ANN BRESNAHAN et al., Plaintiffs and Appellants, v. CITY OF PASADENA et al., Defendants and Respondents; PASADENA TOURNAMENT OF ROSES ASSOCIATION, Real Party in Interest and Respondent.

COUNSEL

Michaels, Ornstein & Kontos and Robert S. Michaels for Plaintiffs and Appellants.

Wendell R. Thompson, City Attorney, for Defendants and Respondents.

Hahn & Hahn and Robert E. Carter for Real Party in Interest and Respondent.

## Opinion

**ROTH, P. J.**—Mary Ann Bresnahan, Dana F. Bresnahan, Robert E. Carlson, Maureen E. Carlson, Douglas G. Ritchie (petitioners) who are taxpayers unsuccessfully sought a writ of mandate directed towards the City of Pasadena (City); Tournament of Roses Association (Association); Richard Pennack, director of community development for City; Harriett Jenkins, city clerk of City; and Ronald Townsend, director of parks for City. Petitioners appeal.

Association is a nonprofit corporation which annually on New Year's Day stages the Tournament of Roses Parade in City, comprising among other features approximately 60 floral-covered floats. The parade is attended by huge crowds of observers in the City and nationally by a television audience estimated to be in excess of 120,000,000. The floral floats for the annual parade must be constructed indoors at a location which will facilitate transport of the floats from the place of construction and decoration to the location from which the parade starts. The size of the floats requires also that the route from the place of construction to the starting place of the parade be free from overhead obstructions such as wires and the like.

Prior to 1970 one of the major float construction sites was known as "Mentone Pavilion." Mentone Pavilion was owned by City and could accommodate 25 floats. In 1969 the Mentone property was condemned for a freeway.

After an extensive investigation for a replacement site it was determined that a suitable location would be in the Arroyo Seco in proximity to the location of the Rose Bowl and Brookside Park. City in 1970 then leased for 50 years to Association 5.4 acres of land in Brookside Park. The lease in paragraph 4 provided that the property was to be used for: ". . . the construction of floats, for float and equipment storage, parking, as a place for gatherings for recreational, social, cultural and educational purposes, and for exhibitions and trade shows, and for any uses reasonably related to the foregoing purposes or in connection with the activities of the Lessee and for such other uses as may be approved in writing by Lessor's Director of Parks."

In accordance with the lease Association with City's approval constructed and completed a float construction building known as Rosemont Pavilion at a cost in excess of $282,000. Thereafter on April 13, 1971, City

gave Association permission to demolish three buildings on the leased premises, as contemplated in the lease, and authorized construction of a new multi-purpose building on the site of the demolished buildings. In 1972 Association subleased the north half of Rosemont Pavilion to a commercial float construction concern on a year-round basis.[1]

City, by Resolution No. 1694 dated March 13, 1973, on condition "that an Environmental Impact Report [EIR] be prepared and filed in accordance with Resolution No. 1536 of the City," approved preliminary plans submitted by Association for a new multi-purpose building to be known as Brookside II.

On March 15, 1973, petitioners filed a petition for mandate seeking to have the lease set aside on the grounds that the property was being used for nonpark purposes.[2] A month later, on April 16, 1973, petitioners amended their petition alleging deficiencies in the EIR that had been prepared as required by Resolution No. 1694.

On April 17, 1973, a hearing was held by City's board of directors on the EIR. Although petitioners, as found by the court, had ample notice they did not appear at that hearing. Aside from other forms of notice, the record shows that copies of the EIR were "hand-delivered to all interested parties . . . and their attorney . . . ." In addition the record shows that appellants were fully informed as to all developments under the lease since the date of its execution. On that same date, April 17, 1973, City approved and adopted the EIR, reapproved the plans for Brookside II and, together with Association, amended the lease to provide that City would have exclusive right to Brookside II each year from January 15 to September 14, inclusive, and Association would have exclusive right to use the premises from September 15 until January 14 of every year.

---

[1] In the original petition for writ of mandate, petitioners sought to set aside the sublease asserting that a sublease of one-half of Rosemont to a private concern was a breach of paragraph 4 of the lease. Later the petition was amended to allege the environmental issues treated in this appeal. During the trial of the mandate action Association filed a "disclaimer and waiver of certain rights" under the lease. The purpose of the disclaimer was to clear up any ambiguities that may have been present under a literal reading of the lease itself, and which could have led to the conclusion that the land was being used for other than park purposes. The trial court found that the waivers became part of the lease and that the City and public would thereby be protected. No appeal has been taken from this aspect of the case.

[2] See footnote 1, *supra*.

After a full hearing on the petition for mandate, it was denied. Petitioners limit their appeal to the following findings of fact and conclusions of law:

"22. The City's Resolution No. 1694 adopted March 13, 1973, was adopted before the City adopted the guidelines promulgated by the California Resources Agency pursuant to the California Environmental Quality Act. Moreover, at the time of the adoption of said resolution, no provision of California law required the City to consider an Environmental Impact Report with regard to the approval of the plans for Brookside Pavilion II. Accordingly, it was permissible for the City to approve the plans for Brookside Pavilion II subject to the condition that an Environmental Impact Report be prepared and filed in accordance with Resolution No. 1536 of the City, and it was permissible for the Environmental Impact Report to be prepared in accordance with Resolution No. 1536 of the City in lieu of being prepared in accordance with the State guidelines.

"23. Although not required to do so, the Environmental Impact Report (which is an exhibit to the declaration of Tony Bassallo received in evidence as Exhibit F) substantially complies with the State guidelines both ·as to content and procedure, fully complies with the City's Resolution No. 1536, and is an objective, informative, and professionally-prepared document. Without limitation upon the foregoing:

a. There was no conflict of interest on the part of the persons preparing or adopting the Environmental Impact Report.

b. The scope of the report was properly confined to the approval of the plans for Brookside Pavilion II. Since the lease itself was executed prior to the effective date of the California Environmental Quality Act, there was no need to consider alternate sites for Brookside Pavilion II outside of the area covered by the lease.

c. In view of the limited scope of the report, adequate notice, time, and opportunity was granted to the City's departments, the City's Board of Directors, and the public to review and comment on the Environmental Impact report.

"24. Petitioners failed to exhaust their administrative remedies and are estopped to complain with regard to the content of or the procedure for the adoption of the Environmental Impact Report in view of their failure to appear at the public hearing at which the City's Board of Directors considered the Environmental Impact Report, notwithstanding their specific knowledge of the time and place of such hearing. They could have brought any alleged deficiencies to the attention of the Board for incorporation in the Report. This was the purpose of the hearing.

"25. The City adopted an interim open space plan (received in evidence as Exhibit O) which substantially complies with Government Code § 65563.

"[*Laches*]

"26. The taxpayers of the City in general, and petitioners in particular, all had either actual knowledge of the facts relating to the authorization which the City gave the Association to build Rosemont Pavilion in March and May, 1970 (see Exhibits I, J, and K) and of the execution of the lease or had actual knowledge of circumstances sufficient to put a prudent man on inquiry as to said facts. Such knowledge was obtained, or could have been obtained, from observation of the construction site, examination of minutes of the City's Board of Directors and other City records, newspaper articles appearing in March, April, and May, 1970 (see Exhibit Q), previous newspaper articles appearing as early as 1968 regarding the proposed project, and the existence of a sign on the construction site identifying the building under construction as the Association's.

"27. Notwithstanding such knowledge, and without any excuse therefor, petitioners failed to bring their proceeding until March 13, 1973.

"28. The Association was prejudiced by this delay in that in reliance on the City's authorization and the validity of the lease, it constructed Rosemont Pavilion at a cost of more than $282,000.00, maintained the leased area including the Fannie E. Morrison Horticultural Center buildings, and incurred expense in planning for Brookside Pavilion II. The City was prejudiced by this delay in that it permitted the Association to build Rosemont Pavilion in a configuration which has limited recreational uses other than float construction and decorating and the viewing thereof, in anticipation that Brookside Pavilion II would be a multi-purpose float construction and recreation building.

"29. Rosemont Pavilion and Brookside Pavilion II together are part of an integrated plan whereby Rosemont Pavilion can be used for float storage, thereby making available Brookside Pavilion II for recreational purposes when it is not needed for float construction and decorating. This integrated plan was at all times contemplated by the City, the Association, and the committee of citizens known as the Arroyo Seco Master Plan Steering Committee, which considered the problem. Only by the completion of this integrated plan will the City and the public achieve the full benefits contemplated at the time of the execution of the lease. Thus, the defense of laches applies not only to issues in this proceeding relating to the validity of the lease and the construction of Rosemont Pavilion, but also to issues relating to the subject amendment of the lease and to Brookside Pavilion II plan approval."

From the foregoing findings, the court concluded:

"5. The City's Resolution No. 1694 adopted March 13, 1973, conditionally approving the construction of Brookside Pavilion II is valid.

"6. The procedure for the adoption of the Environmental Impact Report and the content of the Environmental Impact Report comply with all provisions of law, including the California Environmental Quality Act, guidelines adopted thereunder, and the City's Resolution No. 1536.

"7. There is no requirement of law regarding open space applicable in this proceeding.

"8. Petitioners are barred by the doctrine of laches.

"9. The petition for writ of mandate should be denied.

"10. The City and the Association should recover their costs of suit from the petitioners."

Petitioners contend that the court erred in holding: the EIR did not have to take into account sites other than those within the lease; and that City was under no legal compulsion to require an EIR if it did not desire it.

To determine these issues it is necessary to examine the provisions of the Environmental Quality Act of 1970 (EQA) (Pub. Resources Code,

§§ 21000-21174)[3] and the moratorium which followed it. As passed in 1970, there was an impression currently then public that the act did not involve private projects in which a governmental agency was not involved. (See generally, Seneker, *The Legislative Response to Friends of Mammoth Developers Chase the Will-O'-The-Wisp* (1973) 48 State Bar J. 127, 128.) On November 6, 1972, the Supreme Court in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], held that an EIR was required on a project having a substantial effect on the environment. The Legislature responded to *Mammoth* by an urgency amendment to EQA, providing a "grandfather" clause for projects started before the date of the urgency legislation—December 5, 1972. (Stats. 1972, ch. 1154; Pub. Resources Code, § 21169.) In addition the Legislature provided for 120 day moratorium with respect to any private projects. (§ 21171.) The same section provides that a public agency *may* take into consideration environmental factors in approving or disapproving a project. The 121st day when the moratorium was no longer applicable was April 5, 1973.

The lease at bench was executed prior to the effective dates of the EQA. ■ In April 1971, City authorized Association to demolish three buildings on the site and gave permission to Association to build a new multi-purpose building. These actions were "projects" within the meaning of EQA (see *Friends of Mammoth* (1972) 8 Cal.3d at p. 262; § 21065, subd. (c) ); and were prior to *Mammoth* and the moratorium. By virtue of section 21169 they were legal and valid. The court made a specific finding that "Brookside Pavilion II is, and was, a building contemplated under the terms of the lease," and also found that Rosemont Pavilion was constructed by Association at a cost in excess of $282,000. Petitioners have not attacked either finding.

It was clearly contemplated that there would be two buildings in the leased area. ■ Association had already expended a substantial sum in reliance on this fact, and the trial court on substantial evidence found that petitioners are barred by laches from questioning Association's right to construct a building in the lease area. (*Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors* (1974) 38 Cal.App.3d 257, 265-266 [113 Cal.Rptr. 328].) It appears, therefore, that the scope of any EIR with respect to any construction in the leased area would not be required to embrace a survey as to whether construction of Brookside II would be more desirable in a different area. As will be shown, that issue has been foreclosed to petitioners by section 21169.

---

[3]All further references are to the Public Resources Code unless otherwise specified.

Although petitioners question certain findings, the attacks on the findings are limited to questions of law. Petitioners do not question findings 28 and 29 which declare that the two pavilions were part of an integrated scheme consistent with the use of Brookside Park for recreational purposes when not used for float construction, and concede that Rosemont was of limited recreational use. Nor have petitioners shown any error in the trial court's determination that both City and Association were prejudiced by their delay in the bringing of this lawsuit.

■ The single purpose of section 21169, the "grandfather" clause, appears to have been to grant relief from the hardship engendered by requiring EIR's on projects already approved by the appropriate governmental bodies upon which other parties have acted to their detriment. This purpose appears to be fortified by section 21170 which has a saving clause for cases already in litigation when the party in good faith and in reliance upon the permit by the public body has incurred substantial liabilities for construction. To allow petitioners to now raise questions about alternate locations for Brookside Pavilion II would be to render nugatory the finality that section 21169 has granted to site and type of construction authorized in 1971 by City's Board of Directors.

Appellants place great reliance upon *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795 [108 Cal.Rptr. 377], for their argument that Brookside II cannot be included as part of an approved pre-EQA project wholly aside from the fact that *Inyo* was not within the embrace of any moratorium legislation. A reading of *Inyo* page 806 and the disposition made by the *Inyo* court pages 815-816 persuade us that Brookside was as the trial court found a part of a pre-EQA project.

The next issue is whether City was required to prepare an EIR and, if so, the scope of the required report. Section 21171 which was part of the urgency legislation passed by the Legislature in response to *Mammoth* provided that the EQA did not apply to any "lease, permit, license, certificate or other entitlement for use" for any project as that term is defined in section 21065 until 121 days after the effective date of the section. The effective date was December 5, 1972.

The facts show that City through its board of directors on March 13, 1973, within 120 days before the moratorium had elapsed, approved preliminary plans submitted by Association. On March 13, 1973, City did not legally need an EIR. Nonetheless, City conditioned its approval upon completion of an EIR to conform to the requirements of

Resolution 1536 which City had passed to meet the embrace of *Mammoth*. A report was subsequently prepared and petitioners received copies of the report. We have examined the report and find it to be properly confined to approval of the plans for Brookside Pavilion II.

Nevertheless, petitioners argue that an EIR complete in all respects was not made since the report was not started until April 6, 1973, and as of April 3, 1973, City had passed a resolution requiring all further EIR's to meet the guidelines for the implementation of EQA. Thus, they argue that John Vassallo, who prepared the EIR, did not follow the correct procedure in preparing the EIR and therefore the EIR is defective. The court found that petitioners had not appeared at the hearing when the EIR was submitted to City's board of directors even though they knew of its time and place; that petitioners failed to exhaust their administrative remedies and were estopped to complain with regard to the content or procedure for adoption of the EIR. (See, e.g. *People* v. *West Publishing Co.* (1950) 35 Cal.2d 80 [216 P.2d 441]; *West Publishing Co.* v. *McColgan* (1946) 27 Cal.2d 705 [166 P.2d 861].) To avoid the findings of the trial court petitioners argue that the April 16th meeting was merely a rubber stamp of the project and the final decision had been made the month before. If that is true petitioners cannot complain about the EIR since none was required except that which the City chose to adopt and since the report complied with Resolution 1536 and the EIR as thus prepared was fair and complete. On the other hand, if the April 16, 1973, meeting was the meeting for final decision appellants cannot now complain about alleged deficiencies when they had the opportunity to complain to the board of directors. The fact appears to be as one petitioner admitted, that they deliberately omitted to attend the meeting on April 16th because they sought to test the validity of the EIR in a court action. Petitioners also assert that City was well aware of their objections to and dissatisfaction with project and with the EIR. Petitioners' arguments amount to an admission that they did not like the project. They assert board of directors for City knew they had objected to the project since 1971 and should have known that petitioners would be objecting to the EIR. There is, however, no evidence that their objections to the EIR were ever brought to the attention of City's board of directors. Petitioners cite us to a portion of the record that indicates that a letter was sent to the board. However, there has been no showing what was in the letter or what was stated. ■ On the record before us, it is clear that petitioners did not exhaust their administrative remedies.

Petitioners' conduct suggests that they deliberately chose not to appear before the board and oppose the EIR. They were apparently of the

opinion that EIR was a complete solution for the result they hoped to achieve. ■ EIR is a requirement for information purposes to be used by a governmental body as a tool in careful weighing and balancing of all factors involved before making a decision. (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 814 [108 Cal.Rptr. 377].) The fact that an EIR has been filed does not in and of itself mandate that the conclusions in that report be followed. The decision lies with the governmental agency. (*Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370, 379 [113 Cal.Rptr. 433].) ■ Judicial review is limited to determining whether or not there has been an abuse of discretion. (§ 21168.5.) At bench petitioners deliberately chose not to appear before the board and voice what they felt were the shortcomings of the EIR. Having deliberately chosen to be silent when they had the right and opportunity to speak, the trial court was correct in holding that they could not speak at a time when the law required them to be silent. (*Union Bank & Trust Co.* v. *Gordon,* 116 Cal.App.2d 681, 684 [254 P.2d 644]; *West Publishing Co.* v. *McColgan* (1946) 27 Cal.2d 705 [166 P.2d 861]; compare *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 267 [104 Cal.Rptr. 761, 502 P.2d 1049].)

In light of the decisions we have reached, we need not discuss petitioners' other contentions concerning the scope, depth, breadth and wisdom of the EIR.

The judgment is affirmed.

Fleming, J., and Compton, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 16, 1975. Wright, C. J., did not participate therein.