47 Cal.App.3d 495 (1975)
121 Cal. Rptr. 375
THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff, Cross-defendant and Respondent,
v.
JOSEPH J. BOSIO et al., Defendants, Cross-complainants and Appellants; PRESERVE LOMPOC'S UNIQUE SURROUNDINGS et al., Plaintiffs and Appellants,
v.
DIVISION OF HIGHWAYS, Defendant and Respondent.
Docket No. 43955.
Court of Appeals of California, Second District, Division Three.
April 25, 1975.
*500 COUNSEL
Pier Gherini and John Gherini for Defendants, Cross-complainants and Appellants and for Plaintiffs and Appellants.
Harry S. Fenton, Kingsley T. Hoegstedt, John P. Horgan, Norval Fairman, Francis A. McEnaney and Robert R. Buell for Plaintiff, Cross-defendant and Respondent and for Defendant and Respondent.
OPINION
POTTER, J. 

Statement of the Case
This is an appeal from a judgment in two consolidated actions in which appellants seek to prevent respondent Division of Highways of the Department of Public Works of the Business and Transportation Agency of the State of California (hereinafter "Division of Highways") from carrying out a proposed state highway project known as the Lompoc Bypass, a freeway.
Appellants Bosio and Gherini were named as defendants in a condemnation action (No. SM 11049) commenced by respondent on May 25, 1972, to acquire property for use as right-of-way for the highway project. Their demurrer to the complaint filed October 4, 1972, raised the *501 objection that the complaint did not show whether an environmental impact study and report had been made with respect to such project. That demurrer was overruled on January 24, 1973. In an accompanying statement of reasons the court said, "The proper way to reach this problem would be for the defendants to raise the defense by answer, together with a cross-complaint for injunctive relief." On March 7, 1973, such an answer and a cross-complaint to restrain further progress of the project were filed, asserting that it would have a significant effect upon the environment and that respondent Division of Highways had not complied with the environmental impact report (hereinafter "EIR") requirement of the California Environmental Quality Act (hereinafter "CEQA"). Demurrers and motions to strike the affirmative defense and cross-complaint and for summary judgment thereon were made by respondent; these resulted in an order of June 5, 1973, sustaining the demurrer to and motion to strike the affirmative defense but overruling the demurrer and denying the motion to strike and motion for summary judgment on the cross-complaint. The trial court thereupon severed the cross-complaint for injunctive relief from the other issues in the condemnation action.
The stated basis of the court's orders sustaining the demurrer to and striking the affirmative defense was its holding that the issue of alleged noncompliance with CEQA was not available as a defense to forestall the taking of the property by condemnation. An appeal by appellants Bosio and Gherini from these orders was dismissed by this court on the grounds of nonappealability and mootness, on February 2, 1974. Further attempts to obtain appellate review by extraordinary writ were also unsuccessful, and the condemnation action is still pending, but inactive.
The other action (No. SM 13017) commenced July 12, 1973, by appellants Preserve Lompoc's Unique Surroundings (hereinafter "PLUS")[1] and Homeowners Security Alliance (hereinafter "Alliance")[2] was a petition for writ of mandamus; in it these appellants, as "concerned" citizens and "in the capacity of private attorneys general," also attacked respondent's determination to carry out the project without first complying with the requirements of CEQA.
*502 Responsive pleadings were filed by respondent in both actions, raising the affirmative defense of laches. Thereafter, a supplemental cross-complaint was filed in No. 11049 by appellants Bosio and Gherini, (1) raising additional issues under the National Environmental Policy Act (hereinafter "NEPA"), (2) asserting, in addition to their own interests as condemnees, "the interests of the general public in requiring the cross-defendant to comply with both the National Environmental Policy Act and the California Environmental Quality Act," and (3) seeking fees and court costs for "acting as a private attorney general."
The two actions were then consolidated for an early trial which commenced on July 25, 1973. After 11 days of trial, the matter was submitted. On August 13, 1973, the court announced its intended decision in favor of respondent on the dual bases that it had complied with all requirements of CEQA and that the actions of appellants were barred by laches. The NEPA was found inapplicable by reason of respondent's good faith determination not to qualify the project for federal funds.
Immediately following the filing of the memorandum opinion, respondent indicated its intent to proceed with the project by letting a contract for its construction. Upon application to this court, further activity to carry out the project was ordered halted on August 22, 1973. Subsequently, a peremptory writ issued, extending that order until disposition of this appeal.[3]
Findings were requested by appellants. When proposed findings were lodged by respondent, appellants filed (1) objections to the proposed findings, (2) counterfindings, and (3) request for special findings. The court signed findings and conclusions on November 2, 1973. These were followed on November 8, 1973, by the judgment adjudging that the applications of appellants for writ of mandate and injunctive relief be denied, and that appellants "take nothing by reason of their cross-complaints, complaints and petitions herein." This appeal followed.

Facts
This litigation involves the propriety of action taken by respondent Division of Highways with respect to the Lompoc Bypass, a project to relocate and convert to freeway a segment of Highway No. 1 in Santa Barbara County. As presently constituted, Highway No. 1 follows a route traversing the streets of the City of Lompoc. Lompoc is a small city of *503 some 28,000 residents situated to the south and west of Santa Maria. It is in a valley through which the Santa Ynez River flows northwesterly toward the Pacific Ocean. Both sides of the valley are bordered by coastal hills. The valley proper is largely devoted to agricultural use.

Compliance with CEQA
The project, comprising some five miles of four-lane freeway with four interchanges and a pair of bridges several hundred feet in length across the Santa Ynez River, underwent its original planning phase in the period between 1960 and 1962. Initially it was planned and processed so as to become eligible for federal highway funds, though ultimately the respondent proceeded solely on the basis of state highway funds. In January 1961, respondent held a public meeting in Lompoc to consider alternative locations for the Lompoc Bypass. Interested members of the public attended and were heard; however, the possible effect of the project upon the environment was not discussed at said hearing. On June 21, 1961, the California Highway Commission adopted the present route of the Lompoc Bypass. Thereafter, in 1961 and 1962, respondent consulted with the local agencies and as a result freeway agreements were entered into with the City of Lompoc and with Santa Barbara County providing for the closure of local streets and for access to the freeway in accordance with the provisions of California Streets and Highways Code section 100.2. These agreements showed the general location of the freeway project to be on the west side of the Santa Ynez River adjacent to the easterly portion of the city, and the general placement of interchanges. Geometric maps of the four interchanges were submitted to the Federal Highway Administration which expressed no objection thereto. Under existing informal procedures, this constituted approval thereof.
No further action was taken by respondent to implement the plan to construct the Lompoc Bypass from 1962 until 1969. On September 7, 1969, the Highway Commission approved a budget which authorized $200,000 for right-of-way acquisition for this freeway. Since none of these funds were expended prior to June 30, 1970, they were transferred to the succeeding year's budget and $100,000 was added thereto, making a total authorization of $300,000 for right-of-way acquisition as of June 17, 1970. On October 22, 1970, another $620,000 was authorized for right-of-way acquisition. As of November 23, 1970, the effective date of CEQA, the sum of $20,525 had been spent for right-of-way acquisition. No funds had been authorized for or expended for costs of construction.
*504 After CEQA became effective on November 23, 1970, generally requiring preparation of an EIR with respect to any projects state agencies proposed "to carry out which could have a significant effect on the environment" (Pub. Resources Code, § 21100), the Division of Highways issued a directive for environmental clearance for California highway projects entitled, "Circular Letter No. 71-7," effective February 16, 1971, which under the heading "Application" provided:
"Either an Environmental Statement or Negative Declaration will be required on all projects unless regular right-of-way funds (i.e. capital outlay funds exclusive of hardship and protection funds) or construction funds were budgeted for the project prior to November 23, 1970. Major projects (projects on new location or major reconstruction projects on adopted routes) that have advanced beyond the regular right-of-way funding stage must be reviewed to determine if the proposed design minimizes adverse environmental consequences and to examine the highway planning to insure that its environmental consequences were thoroughly considered. Such projects, to the extent practical, should be modified to incorporate additional elements or features identified and considered prudent to minimize environmental harm. This review will be made by appropriate Headquarters and District personnel and representatives of the FHWA. After the review, a determination will be made on the need for Environmental Statements for projects in this category."
This review procedure, in lieu of a full environmental impact report, was patterned after interim guidelines issued by the Federal Highway Administration on November 24, 1970. Under the federal guidelines, state highway projects which had "received design approval before February 1, 1971," were required only to undergo "reassessment" by the state agency in consultation with the Federal Highway Administration Division Engineer. An environmental impact statement under NEPA was dispensed with unless requested by the Division Engineer.
Respondent Division of Highways considered the project to have received federal design approval. It, therefore, combined the "reassessment" of the project in consultation with the Federal Highway Administration and its own environmental review pursuant to Circular Letter No. 71-7. As a result, an "Environmental Fact Sheet" was compiled. This was submitted to and approved by the Federal Highway Administration and based thereon respondent Division of Highways determined that an environmental impact report was not needed.
*505 As the trial court expressly found, the environmental review of the Lompoc Bypass and the Division of Highway's final Environmental Fact Sheet did not constitute the preparation of "a detailed environmental impact report (EIR) as defined by section 21100 of the California Environmental Quality Act of 1970." Due consideration was given to all the matters specified in the Division of Highway's Circular Letter No. 71-7, that is, the project was reviewed "to determine if the proposed design minimizes adverse environmental consequences and to ensure that its environmental consequences were thoroughly considered," but there was no comprehensive description of all the environmental consequences of the project nor any consideration given to the alternative of abandoning it. The trial court also found, and neither party disputes the finding that "the Lompoc Bypass is a project which would have a significant effect on the environment, if constructed as proposed."[4]
In its Environmental Fact Sheet respondent concluded that additional consideration should be given to a noise barrier, that precautions should be taken "to revegetate all cut and fill slopes with grass compatible with the area," but that the project "is justified in itself as an environmental help to the City of Lompoc." Respondent treated the fact sheet as a determination that the project could proceed without preparation of an EIR. Thereafter, the Lompoc Bypass continued to receive environmental review and consideration. As a result of a study of damage resulting from a 1969 flood of the Santa Ynez River, the bridges across the river were lengthened so as to reduce backwater effects. Erosion studies were made with respect to the major cut at the southern end of the project which resulted in further design details enhancing erosion control and providing for a more natural appearance. An extension of an existing city street in connection with an access road was realigned to avoid the destruction of a grove of trees and the grade of a portion of the freeway was lowered in order to reduce noise in a residential area. As this subsequent review progressed, the Division of Highways continued its preparations to commence construction of the Lompoc Bypass.
*506 Other changes in the design details, not based upon environmental considerations, were considered and adopted. All interchanges were widened from two-lane to four-lane, the median strip was widened to 26 feet and the right-of-way requirements adjusted to compensate therefor.
Concurrently, the Division of Highways proceeded with steps necessary to acquire the right-of-way required for the project and to make provision for its construction. In 1971 and 1972 negotiations with land owners progressed. On March 17, 1971, the State Highway Commission passed a resolution of condemnation of the real property required for the right-of-way. In October 1971 the State Highway Commission made the first allocation or authorization of funds for construction of the project. At that time $9.75 million were authorized for such purpose, with provision made for the money to be available over a period of several years. Right-of-way acquisition continued during 1972 and 1973.

Laches
Considerable evidence was received concerning appellants' knowledge of the steps being taken by respondent with respect to the Lompoc Bypass from the time of its inception. On the basis of this evidence, the court found that in late 1962 appellants Bosio and Gherini inquired concerning the effect of the project upon their property and in 1963 the right-of-way lines were staked thereon. Thereafter, said appellants were supplied with various information concerning the project. Appellant Gherini was an attorney at law and as such was aware of the environmental laws at the time of their enactment. In February 1971 appellant Gherini spoke to the Board of Supervisors of Santa Barbara County protesting the bypass project but instituted no legal proceedings on environmental grounds until he raised the issue of noncompliance with CEQA by the demurrer filed October 23, 1972, in the condemnation action.
Appellant PLUS became actively engaged in opposition to another freeway project in the Lompoc area. This project, known as the Harris Grade Project, adjoined the Lompoc Bypass project to the north and was designed to connect the north end of the bypass with an existing four-lane expressway which, in turn, connected with another such expressway to Santa Maria. PLUS was formed primarily to challenge the Harris Grade Freeway on environmental grounds and it led an active and extensive opposition thereto, commencing in June 1970. Though *507 PLUS passed a motion to study the impact of the Lompoc Bypass on June 30, 1970, the organization decided to attack the Harris Grade Freeway but make no attack on the Lompoc Bypass. In June 1971 members of PLUS were advised by the Highway Commission that it did not intend to prepare an EIR on the Lompoc Bypass project. In response to an inquiry by the chairman of PLUS in June 1972 the Highway Commission advised that a major portion of the construction funds for the project had been included in the 1972-1973 budget and that the project was then scheduled for advertising in late 1973.
Persons involved in the formation of appellant Alliance first manifested concern with respect to the construction of the Lompoc Bypass in 1961 when they appeared to protest the location of the freeway on the westerly side of the Santa Ynez River. This protest was ultimately withdrawn before the freeway agreements were executed in 1962. Though the Alliance was not formally organized until 1973, the residents of the affected neighborhood, led by persons who later were active in the organization of the Alliance, protested the alignment of the Central Avenue connection to the bypass in 1971 on the basis that it would destroy an existing grove of trees. This activity contributed to respondent's determination to realign that connection in 1971. Members of that group were at that time supplied with a copy of the Environmental Fact Sheet and of the position of the Division of Highways that it was a sufficient compliance with the CEQA. At that time the recipient of this copy discussed the environmental laws with his attorney with particular reference to the extension of Central Avenue in the immediate area of his property but concluded that he had neither the resources, time or organization to fight the matter.
It was not until June 1973 that the Alliance was formally organized as a homeowners group to oppose the Lompoc Bypass project. This was followed shortly thereafter by their joinder with PLUS in filing their joint petition for mandate in July 1973.
The evidence with respect to the detriment allegedly suffered as a result of appellants' delay all related to the expenditures made on the project as it progressed, and the circumstances with respect to the bids for its construction.
The evidence with respect to expenditures detailed the costs of acquisition of right-of-way and related expenses. This evidence indicated *508 that by May 25, 1972 (the date the condemnation action against appellants Bosio and Gherini was filed), the total capital outlay for right-of-way acquisition was $93,000, but that the amount obligated in that connection increased to $1,205,000 by October 3, 1972 (the date of the demurrer to the condemnation complaint) mostly as a result of a $962,000 settlement for relocation of plant facilities with one land owner. The court, however, did not make findings concerning the date or extent of any such expenditures or obligations other than as of the time of trial.
Evidence was received showing that advertising for bids on the construction contract was completed on June 5, 1973, bids were opened June 20, 1973, that the low bid was $350,000 below the state's estimated cost of construction, and the last date for acceptance was August 13, 1973. Opinions by qualified experts were received indicating that if this low bid were lost, the state would sustain a direct monetary loss of between $700,000 and $1,000,000. The court made a finding to this effect.
As the conclusions of law signed by the court indicate, the judgment in favor of respondent had two independent bases. The first basis was the court's holding that the National Environmental Policy Act was inapplicable[5] and that the requirements of CEQA had been complied with by the environmental review and Environmental Fact Sheet completed in 1971. The second basis for the judgment was the court's conclusion that the appellants and each of them were barred from any relief in this action by laches and unreasonable delay, by reason of which "the state would be unjustly harmed" if relief were granted.

Contentions
Appellants contend:
(1) That respondent failed to comply with the requirements of CEQA that an EIR be made before proceeding with the Lompoc Bypass Project.
(2) That respondent has failed to comply with the requirements of NEPA that an environmental impact statement be prepared with respect to said project.
*509 (3) That respondent has failed to comply with the public hearing requirements of the Federal Aid Highway Act, as amended, 1968 (23 U.S.C. § 128(a)).
(4) That the court erred in finding appellants barred by laches, and
(5) That appellants are entitled to reasonable attorneys' fees as private attorneys general.
Respondent takes issue with each of the above contentions of appellants.

Issues
The issues which are dispositive of the merits of this appeal are those created by appellants' contentions (1) and (4).[6] In addition, there is appellants' claim for attorneys' fees. The pertinent issues, therefore, are as follows:
1. Did the environmental review undertaken and the Environmental Fact Sheet produced by respondent constitute compliance with CEQA with respect to the Lompoc Bypass Project?
2. Did the court err in finding appellants' claims barred by laches?
3. Are defendants entitled to an award of attorneys' fees?

CEQA Was Not Complied With
(1a) Appellants' attack upon the Lompoc Bypass is governed by the provisions of Public Resources Code section 21168.5, which provides:
"In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."
*510 The abuse of discretion charged is that respondent has "not proceeded in the manner prescribed by law" because it has proceeded to carry out the project without preparation of an EIR as required by CEQA. The first question, therefore, is the applicability of the EIR requirement.
The facts bearing upon the applicability of the EIR requirement to the Lompoc Bypass are essentially undisputed. The project was initiated almost 10 years prior to the effective date of CEQA. Procedures necessary to establish its location and general design features and to authorize the necessary closures of and connection with local streets were completed within two years thereafter. Though it was a project which would have a significant effect on the environment, no significant consideration was given environmental factors because there were no laws at that time requiring it. Fiscal considerations dictated postponement of the project for several years with the result that the initial authorization of funds for right-of-way acquisition did not occur until approximately one year prior to the effective date of CEQA. Immediately prior to the effective date of the act, additional funds were authorized for right-of-way acquisition, bringing the total to $920,000, but no funds were authorized for construction of the project until October 1971. The action taken by the Highway Commission at that time was described by Mr. Pengilly, principal highway engineer and chief of the Budget Development and Control Branch of the Division of Highways, who testified as follows: "The first state authorization for construction funds for this project was in October 1971." He further testified that the amount approved was in excess of $9,700,000; however, "it was split-financed so the funds were spread over a several year period." The provisions of Streets and Highways Code sections 183 and 75[7] clearly *511 make the State Highway Commission the agency which authorizes expenditure of funds from the State Highway Fund for highway construction.
At the time the above action was taken to authorize the expenditure of over $9.7 million for construction of the Lompoc Bypass without preparation of an EIR, sections 21100 and 21102 of the Public Resources Code read as follows:
"All state agencies, boards, and commissions shall include in any report on any project they propose to carry out which could have a significant effect on the environment of this state, a detailed statement by the responsible state official setting forth the following:
"(a) The environmental impact of the proposed action.
"(b) Any adverse environmental effects which cannot be avoided if the proposal is implemented.
"(c) Mitigation measures proposed to minimize the impact.
"(d) Alternatives to the proposed action.
"(e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.
"(f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented." (Pub. Resources Code, § 21100.)
"No state agency, board, or commission shall request funds, nor shall any state agency, board, or commission which authorizes expenditures of funds, other than funds appropriated in the Budget Act, authorize funds for expenditure for any project, other than a project involving only planning, which could have a significant effect on the environment unless such request or authorization is accompanied by a detailed statement setting forth the matters specified in Section 21100." (Pub. Resources Code, § 21102.)[8]
*512 The language of these two sections is unambiguous and mandatory. What they literally provide is that an EIR is required before any state agency proceeds "to carry out" any environmentally significant project in respect of which either a request for or an authorization of funds[9] is required after the effective date of CEQA. The only exemption provided is for "funds appropriated in the Budget Act,"[10] and no distinction between ongoing and new projects is suggested; to complete an ongoing project is to "carry out" such project. The decision to do so is to be governed by the results of the EIR process.
(2) Section 21102 is thus at the same time a deadline for the completion of Environmental Impact Reports on projects initiated after the effective date of the act and a conclusive standard for determining when projects initiated prior thereto cannot be exempted from the EIR requirement. As written, it effectively and logically accomplishes both objectives. As applied to projects initiated after the effective date of the act, it determines the stage beyond which a project may not proceed without preparation of an EIR, to wit, the initial request for or authorization of funds. Once the EIR requirement is complied with, subsequent requests or authorizations may be "accompanied" by the original EIR unless, as indicated by section 21166, substantial changes in the project or in the circumstances under which it is being undertaken require "major revisions of the environmental impact report."[11] If such major revisions are required, section 21102 clearly requires the revised environmental impact report to accompany any future requests or authorizations for funds.
(1b) As applied to projects initiated before the effective date of CEQA, section 21102 provides a categorical and logical minimum requirement to establish nonapplicability based on "ongoing project" *513 status. If the funds necessary for the completion of a project have not been authorized, it is patent that the agency responsible for authorizing additional funds still has the power to determine whether "to carry out" the project to completion. Were this not true, it would have no discretion to withhold authorization of the funds.
The interpretation which respondent has consistently placed upon section 21102 and now urges dispenses with the requirement for an EIR if the initial authorization of funds for the project occurred prior to the effective date of CEQA. This position was asserted by respondent and rejected by the court in Keith v. Volpe (C.D.Cal. 1972) 352 F. Supp. 1324, 1337, footnote 16, and it is unsupportable. The requirement of section 21166 for major revisions of EIRs assumes that multiple decisions may be made on the basis thereof. Respondent's interpretation would render section 21166 virtually meaningless by confining its effect to situations in which the changes requiring the revisions occur between the time of initial preparation of the EIR and the initial funding. In addition, the provisions of section 21102 apply with like effect to both requests for funds and to authorizations for expenditure of funds. If the reference to authorizations encompasses only initial authorizations, then only initial requests are governed thereby. The existence of previous requests (perhaps refused) would bear no rational relationship to the objects of CEQA and could not have been intended to result in nonapplicability.
Such a categorical minimum requirement is highly important. Without it the courts are left in the untenable position of being obliged to undertake determinations of the merits of environmental impact decisions in order to decide whether the responsible agency has proceeded in a manner required by law. As our Supreme Court pointed out in No Oil, Inc. v. City of Los Angeles, 13 Cal.3d 68 [118 Cal. Rptr. 34, 529 P.2d 66], these are separate questions. The court said (at pp. 74-75): "Since, as we shall explain, the judgment of the superior court sustaining the city's decision must be reversed because of the city's failure to proceed in the manner required by law, we do not reach the question whether that decision is supported by substantial evidence."
Where no such categorical standard as that set forth in section 21102 was available, the courts have struggled, with little success, to evolve a workable standard. The NEPA lacks any express standard for permitting nonapplicability on the basis of ongoing project status. Arlington Coalition on Transportation v. Volpe (4th Cir.1972) 458 F.2d 1323, cert. den., sub nom Fugate v. Arlington Coalition (1972) 409 U.S. 1000 [34 *514 L.Ed.2d 261, 93 S.Ct. 312], is a leading case attempting to state a workable standard. After characterizing the "design approval" test as "arbitrary and capricious," the court said (458 F.2d at pp. 1331, 1332): "Doubtless Congress did not intend that all projects ongoing at the effective date of the Act be subject to the requirements of Section 102. At some stage of progress, the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom that it might no longer be `possible' to change the project in accordance with Section 102. At some stage, federal action may be so `complete' that applying the Act could be considered a `retroactive' application not intended by the Congress. The congressional command that the Act be complied with `to the fullest extent possible' means, we believe, that an ongoing project was intended to be subject to Section 102 until it has reached that stage of completion, and that doubt about whether the critical stage has been reached must be resolved in favor of applicability.
".... .... .... .... ...
"We cannot, of course, define for all cases the point of completion beyond which Section 102(C) is no longer applicable. We are certain, however, that Arlington I-66 has not yet reached that point: P.S. & E. approval[[12]] has not been given, construction contracts have not been awarded, and actual construction on the highway itself has not begun."
California courts confronted with the same problem have adopted the Arlington test. For example, in County of Inyo v. Yorty, 32 Cal. App.3d 795 [108 Cal. Rptr. 377], involving a local agency not governed by section 21102, the court rejected nonapplicability on an "ongoing project" basis in reliance on the decision in Arlington. The court said (at p. 808): "No single standard can be gleaned from the federal cases on the issue of the point in time or the degree of completion at which, in the language of Arlington, supra (at p. 1331), `the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom that it might no longer be "possible" to change the project....' The Arlington court, referring to NEPA, continues: `The congressional command that the Act be complied with "to the fullest extent possible" means, we believe, that an ongoing project was intended to be subject to Section 102 until it has reached that stage of completion, and that doubt about whether the critical stage has been reached must be resolved in favor of applicability.' We have no doubt that the project of *515 underground-water extraction herein presented has not reached such point of effective and practical economic or ecological finality as to render meaningless any enforcement of CEQA."
Similar reference was made to the Arlington standard in County of Orange v. Valenti, 37 Cal. App.3d 240 [112 Cal. Rptr. 379], where the court said (at p. 248): "Paraphrasing the above standard, an environmental impact report would be impracticable here only if the state could show that the costs of moving the office to another location would clearly outweigh the environmental benefits of such a move. That would require a factual showing which has not been made here because of the procedural status of this case."
Such a factual determination by the court would involve inquiry into the merits of the environmental decision in order to determine applicability of the EIR requirement. An interpretation of section 21102, limiting the circumstances under which such inappropriate inquiries are required is, therefore, desirable.
We are, moreover, required to construe the provisions of section 21102 liberally as mandated by our Supreme Court. In its most recent decision in No Oil, Inc. v. City of Los Angeles, supra, referring to another section of CEQA, that court said (13 Cal.3d at pp. 83-84): "In interpreting section 21151, our principal guide is the fact, recognized in Friends of Mammoth, `that the Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' (Friends of Mammoth v. Board of Supervisors, supra, 8 Cal.3d at p. 259; accord, County of Inyo v. Yorty (1973) 32 Cal. App.3d 795, 804; [108 Cal. Rptr. 377]; see Environmental Defense Fund, Inc. v. Coastside County Water Dist., supra, 27 Cal. App.3d at p. 701.) The EIR is the `heart' of CEQA (County of Inyo v. Yorty, supra, 32 Cal. App.3d at p. 810), the principal method by which environmental data are brought to the attention of the agency and the public. Consequently that interpretation of section 21151 which will `afford the fullest possible protection to the environment within the reasonable scope of the statutory language' (Friends of Mammoth v. Board of Supervisors, supra, 8 Cal.3d at p. 259) is one which will impose a low threshold requirement for preparation of an EIR. [Fn. omitted.]" (Italics added.)
As the court said in Bozung v. Local Agency Formation Com., 13 Cal.3d 263, 274 [118 Cal. Rptr. 249, 529 P.2d 1017]: "It is, of course, too *516 late to argue for a grudging, miserly reading of CEQA. As the 1972 additions and amendments to CEQA prove, [] [we] correctly gauged the legislative intent in Friends of Mammoth v. Board of Supervisors, 8 Cal.3d 247, 259 [104 Cal. Rptr. 761, 502 P.2d 1049], when [] [we] concluded that the Legislature intended CEQA `to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' (Italics added.)"
(3) For all of the foregoing reasons, we construe section 21102 of the Public Resources Code as an express and categorical minimum requirement for nonapplication of the EIR requirement to ongoing projects; no such project not fully funded prior to the effective date of CEQA is exempt.
Inasmuch as the express language of section 21102 required the preparation of an EIR before funds were authorized for the construction of the Lompoc Bypass, respondent's reliance upon various administratively promulgated "guidelines" is misplaced. Respondent cites in this respect (1) its own Circular Letter No. 71-7 of February 16, 1971, (2) interim guidelines proposed by the Office of Planning and Research and accepted by the Governor and Cabinet on May 4, 1971, (3) sections 15070 and 15021 of title 14 of the California Administrative Code, and (4) respondent's departmental guidelines adopted April 4, 1973, section 1502.1. Items (1) and (2) are claimed by respondent to have been validated by the adoption, effective December 5, 1972, of section 21172.5 of the Public Resources Code and thereby made determinative of the propriety of respondent's action taken pursuant thereto. Items (3) and (4) are cited as subsequent regulations confirming the propriety of the former guidelines under which respondent acted.
Before proceeding with a discussion of the various guidelines relied upon by respondent, cognizance must be taken of the rule governing validity of such regulations implementing statutory provisions. Section 11374 of the Government Code provides:
"Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute.
"Any existing rules or regulations conflicting with this section are hereby repealed."
*517 In Morris v. Williams, 67 Cal.2d 733 [63 Cal. Rptr. 689, 433 P.2d 697], our Supreme Court stated the effect of this Government Code provision. The court said (at p. 748): "While the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to great weight, nevertheless `Whatever the force of administrative construction ... final responsibility for the interpretation of the law rests with the courts.' (Whitcomb Hotel v. California Emp. Com. (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405], and authorities there collected.) Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations. (Whitcomb Hotel v. California Emp. Com., supra; Hodge v. McCall (1921) 185 Cal. 330, 334 [197 P. 86]; Boone v. Kingsbury (1928) 206 Cal. 148, 161-162 [273 P. 797]; First Industrial Loan Co. v. Daugherty (1945) 26 Cal.2d 545, 550 [159 P.2d 921]; see Brock v. Superior Court (1938) 11 Cal.2d 682, 688 [81 P.2d 934].)"
More recently, with specific reference to the CEQA and regulations thereunder, our Supreme Court said in Desert Environment Conservation Assn. v. Public Utilities Com., 8 Cal.3d 739, 742-743 [106 Cal. Rptr. 31, 505 P.2d 223]: "This is not to say, of course, that regulations under the EQA will be immune from review once adopted by the commission. An administrative regulation authorized by statute is invalid unless it is `consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute.' (Gov. Code, § 11374.) A regulation that fails to satisfy this standard is properly subject to judicial challenge."
The effect of respondent's Circular Letter No. 71-7[13] was to make optional the applicability of the EIR requirement whenever right-of-way *518 or construction funds were budgeted for the project prior to November 23, 1970. Such projects were required to be "reviewed to determine if the proposed design minimizes adverse environmental consequences and to examine the highway planning to ensure that its environmental consequences were thoroughly considered." This was consistent with a May 4, 1971, interim guideline relating to application of the act proposed by the office of planning and research.[14]
Neither of these guidelines, however, was consistent with the express provision of section 21102 of the Public Resources Code, as above construed, insofar as they contemplated an administrative determination of nonapplicability to projects not yet fully funded.
The contemplated "review" to determine if adverse environmental consequences had been considered and fully minimized was not a lawful alternative to the preparation of an initial EIR. The function of the EIR is not "to substantiate programs already decided upon." (Environmental Defense Fund v. Hardin (D.C. Cir.1971) 325 F. Supp. 1401, 1403.) Post hoc evaluations are not a valid substitute for full environmental research as a precedent to program formulation. As our Supreme Court said in No Oil, Inc. v. City of Los Angeles, supra, 13 Cal.3d 68, referring to a city council resolution declaring the intent of a previously taken action (at p. 81): "At the time of the January 8, 1973, resolution, the council had already approved the project. No resolution adopted on that date can constitute that determination of environmental impact prior to approval of the project which the act requires. The resolution adopted at that meeting represents simply an example of that `post hoc rationalization' of a decision already made, which the courts condemned in Citizens to Preserve Overton Park v. Volpe (1971) 401 U.S. 402, 420 [28 L.Ed.2d 136, 155, 91 S.Ct. 814] and Environmental Defense Fund, Inc. v. Coastside County Water Dist. (1972) 27 Cal. App.3d 695, 706 [104 Cal. Rptr. 197]."
*519 Environmental Defense Fund, Inc. v. Coastside County Water Dist., 27 Cal. App.3d 695 [104 Cal. Rptr. 197], cited by the Supreme Court in No Oil, supra, stated in this respect: "We observe, too, that the EIR, having been prepared and submitted within a short time, under compulsion of the injunction, must be specially scrutinized. Since the project was then under way, there would be an understandable tendency to rationalize what was already done. A study must not be a `"post hoc rationalization."' (Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 [28 L.Ed.2d 136, 155, 91 S.Ct. 814].) The research is to be directed towards formulation of a program, not to substantiate a program already decided upon. (Environmental Defense Fund v. Hardin, 325 F. Supp. 1401.) We say this without suggesting bad faith on the part of the district; we discern no reason to doubt its protestations of eagerness to protect the beauty and livability of the domain which it serves. But the pressure of time was acute. No doubt much of what was in the EIR had been thought of earlier; nevertheless, the thrust of the EIR had to be toward the theretofore unreported elements of environmental protection." (27 Cal. App.3d at p. 706.)
We likewise find no suggestion of bad faith on the part of respondent in its adoption of a review, rather than environmental impact report procedure, for ongoing projects. We ascribe it to the rather universal failure of state agencies to take CEQA seriously prior to the decision of our Supreme Court in Friends of Mammoth, supra. As the court observed in Friends of Lake Arrowhead v. Board of Supervisors, 38 Cal. App.3d 497, 513 [113 Cal. Rptr. 539]: "Prior to Friends of Mammoth, the CEQA was generally believed to apply only to projects undertaken or funded by public agencies. (Seneker, The Legislative Response to Friends of Mammoth, 48 State Bar J. 127, 128.) Partly because of the failure of the state office of planning and research to formulate and communicate necessary guidelines to public agencies, the act was largely ignored even as to public projects." (Italics added.)
Respondent's attempts to find confirmation for the propriety of its 1971 circular letter in the provisions of section 15070[15] of title 14 of the *520 California Administrative Code, relating to ongoing projects and the definition of approval found in section 15021 thereof, does not improve its position. These regulations, under the general rule above announced, must be construed so as to be consistent with the provisions of section 21102 of the Public Resources Code. Properly construed, they are consistent and they make no provision whatever for the nonapplicability of EIR requirements to ongoing projects as to which the necessary funds have not been fully authorized.
Section 15070 simply provides that if a project for which all the funds have been authorized, has not progressed to the point where all such funds have been spent, an EIR shall nonetheless be prepared if it is "feasible to modify the project or abandon it." No reference whatever is made to a project for which all funds have not already been authorized, nor to the authorization of funds.
The definition of approval contained in section 15021 as "the decision by a public agency which commits the agency to a definite course of action" reinforces rather than detracts from this interpretation. As previously stated, it is difficult to see how an agency can be "committed" to a project if it still has authority to authorize or not to authorize funds necessary to its completion.
(4) The remaining contention urged by respondent in support of its position is that Circular Letter No. 71-7 has been validated by the provisions of section 21172.5[16] of the Public Resources Code, effective December 5, 1972. It is questionable whether this section, which apparently was adopted because of the prior failure of the office of *521 planning and research to have effectively "coordinated the development of objectives, criteria and procedures to assure the orderly preparation and evaluation of environmental impact reports," as required by original section 21103, was intended to have any retroactive effect upon action taken under previously adopted guidelines. As the court said in Friends of Lake Arrowhead v. Board of Supervisors, supra, 38 Cal. App.3d at page 513: "Partly because of the failure of the state office of planning and research to formulate and communicate necessary guidelines to public agencies, the act was largely ignored even as to public projects. [Citation.] Sections 21171 and 21172.5 were enacted in order to allow time for the preparation and adoption of guidelines for the implementation of the CEQA as amended by the urgency measure of December 5, 1972."
Moreover, even if section 21172.5 were intended to retroactively validate guidelines or actions taken thereunder, it would have no effect upon the above quoted section of Circular Letter No. 71-7 relating to "application" of the EIR requirement.
In the first place, the only objectives, criteria and procedures referred to are those which govern (a) "the evaluation of projects" and (b) "the preparation of environmental impact reports on such projects when required by this division." (Italics added.) Criteria governing application of the EIR requirement do not fall into either category. There is a clear distinction between criteria for the evaluation of projects and criteria for determining applicability of the EIR requirement.[17] Likewise distinct are criteria determining applicability of the EIR requirement and criteria "for preparation of environmental reports when required by this division." The last phrase clearly makes the express provisions of the act determinative as to when such reports are required.
In the second place, the objectives, criteria and procedures referred to in section 21172.5 are those "adopted by public agencies in compliance with this division." (Italics added.) Standards were first stated for such adoption in section 21082,[18] effective the same date as section 21172.5. *522 Section 21082 does authorize "all public agencies" to adopt objectives, criteria and procedures. They are, however, required to "be consistent with the provisions of this division."
It is thus manifest that section 21172.5 was not intended to validate any objectives, criteria or procedures adopted before or after its effective date which were inconsistent with the express provisions of section 21102 of the Public Resources Code. Inasmuch as respondent's Circular Letter No. 71-7 was inconsistent with section 21102 insofar as it dispensed with the EIR requirement in respect of projects not fully funded, it was not validated.
(1c) The conclusion necessarily follows that respondent did not proceed "in the manner required by law" and, therefore, abused its discretion in carrying out the Lompoc Bypass project on the basis of a post hoc review of its environmental aspects and the Environmental Fact Sheet.

The Trial Court Erroneously Applied Laches to Bar Appellants' Action
(5a) Evidence was received with respect to each group of appellants from which the court could infer that they delayed asserting the claim that an EIR was required for extended periods during which they either had knowledge that defendant was not complying with CEQA, or were chargeable with such knowledge.
This evidence supported the court's findings that as early as 1962 appellants Bosio and Gherini were aware of the project, and though they had continuing contact with the Division of Highways concerning it in 1970 and 1971, they did not "inquire as to the environmental clearance of the project," despite appellant Gherini's status as an attorney, "who knew of the existence of the various environmental statutes at the time of their enactment," and did not raise "the issue of noncompliance with CEQA" until their demurrer to the complaint in the condemnation action filed October 4, 1972.
*523 The evidence with respect to appellants PLUS and Alliance supports the court's findings that representatives of the former were advised in June 1971 that respondent did not intend to prepare an EIR, and representatives of the latter obtained similar knowledge in November 1971; yet neither group asserted noncompliance with the EIR requirement as an objection to such project until the filing of their petition for mandate in June 1973. On the basis of these findings, the court concluded that all of the appellants were chargeable with "unreasonable delay."
If there were a legally cognizable prejudice demonstrably resulting from this delay, we probably would not find it appropriate to disturb either these findings or the court's conclusions therefrom. The doctrine of laches, however, requires not only unreasonable delay but as well a showing that the party raising the defense suffered a detriment.
"We have consistently rejected the concept that lapse of time less than the period of limitations in itself constitutes a defense. The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay. As pointed out in Brown v. State Personnel Board (1941) 43 Cal. App.2d 70, 79 [110 P.2d 497]: `If because of his delay in seeking his remedy, without offering a satisfactory explanation for the delay, a prejudice results to his adversary, he will be precluded from enforcing his demand. It is not so much a question of the lapse of time as it is to determine whether prejudice has resulted. If the delay has caused no material change in statu quo, ante, i.e., no detriment suffered by the party pleading the laches, his plea is in vain.' These requirements apply equally to the defense if raised by a public agency." (Conti v. Board of Civil Service Commissioners, 1 Cal.3d 351, 359-360 [82 Cal. Rptr. 337, 461 P.2d 617].)
(6) The trial court concluded that by reason of appellants' delay "the state would be unjustly harmed by the issuance of an injunction in this action." The only findings relating to any prejudice or detriment suffered by respondent are findings Nos. 30 through 34.[19] Inasmuch as the court found that appellants Bosio and Gherini had raised the issue of *524 noncompliance with CEQA by their demurrer on October 4, 1972, these findings (all of which found detriment incurred "as of the date of trial") failed to deal with the issue of detriment incurred in reliance upon a belief that the project would not be challenged on environmental grounds. Appellants called attention to the deficiency of the findings in this respect by requesting special findings of fact with respect to alleged prejudice caused by appellants' delay.[20] In view of this request, inadequacy of the findings with respect to the alleged prejudice cannot be excused on the basis of any implied findings.
In Morris v. Thogmartin, 29 Cal. App.3d 922 [105 Cal. Rptr. 919], the court discussed at length the effect of sections 632 and 634 of the Code of Civil Procedure and reviewed the authorities decided since said sections were amended to their present form. The court said (at p. 927):
"Section 632 provides in part: `Where findings are required, they shall fairly disclose the court's determination of all issues of fact in the case.'
"Section 634 as amended in 1959 and 1968 states: `When written findings and conclusions are required, and the court has not made findings as to all facts necessary to support the judgment or a finding on a material issue of fact is ambiguous or conflicting, and the record shows that such omission, ambiguity or conflict was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663, that the trial court found in favor of the prevailing party as to such facts or on such issue.'
"The broad purpose of the 1959 amendment to section 634 was to overcome the effects of the doctrine of implied findings by authorizing *525 the filing of a request for specific findings. (4 Witkin, Cal. Procedure (1971) Trial, § 341 (c), p. 3142.) [Fn. omitted.]"
(5b) There is, however, a more fundamental reason why the defense of laches cannot be held to have been established in this litigation. The alleged detriment on the basis of which the trial court upheld the defense was solely economic loss allegedly incurred by respondent Division of Highways. Each of the findings in this respect correctly points out that any such economic loss, if sustained, would be sustained by "the state." As the court observed in People v. Department of Housing and Community Development, 45 Cal. App.3d 185, 197 [119 Cal. Rptr. 266], in which the Department of Housing and Community Development and its permittee asserted laches as a defense against a district attorney suing in behalf of the state: "The department is not a separate entity; rather, it is an administrative segment of the state government. (Gov. Code, § 11150; Millholen v. Riley (1930) 211 Cal. 29, 32 [293 P. 69].) The director is sued in his official capacity and has no interest apart from his obligation to administer state law. The state here contends with itself through separate spokesmen, each espousing the general public interest, each expressing a conflicting view concerning the law and the status of the citizen who stands before the law." (Italics added.)
Laches was, however, held available as a defense because: "The state here seeks annulment of its own official act upon the strength of which the citizen has suffered loss and spent money to the tune of $40,000." (45 Cal. App.3d at p. 197.)
This was consistent with our Supreme Court's reference in Friends of Mammoth v. Board of Supervisors, supra, 8 Cal.3d at page 272, to the availability of laches as a means "to avoid possible hardship to parties who have relied on permits" issued prior to the date of the decision.
Where, as here, there are no such losses allegedly suffered by private citizens raising the defense of laches, we are truly confronted with a situation in which the state "contends with itself through separate spokesmen." The appellants all have sued, not only in their own right but as well as representatives of the People of this state, enforcing in their behalf the strong public interest in ecology preservation manifested by CEQA. No real question can be raised as to their standing to do so. (Bozung v. Local Agency Formation Com., supra, 13 Cal.3d at p. 272.) It is thus apparent that respondent's defense of laches is in effect an assertion that the People's interest in the preservation of their environment and *526 their interest in having all state agencies proceed in accordance with law must, under the circumstances of this case, be subordinated to the People's interest in economical government.
Many decided cases have dealt with the role of the defense of laches in environmental cases, and though certain principles applicable to the situation presented in this case are stated therein, none of them constitutes controlling precedent.
In County of Inyo v. Yorty, supra, the court rejected the defense of laches as a bar to the county's action to restrain the City of Los Angeles from increasing ground water pumping operations without preparing, certifying and filing an EIR. Several reasons were ascribed for the rejection of the defense, including "evidence that County acted with reasonable dispatch," and the lack of a "showing of prejudice to the City by whatever delay has been occasioned." The court referred, however, as well to the impact of public policy upon the matter. It said in this connection (32 Cal. App.3d at pp. 812-813):
"(1) There is a general public policy in requiring public officials to obey statutes. (Environmental Defense Fund v. TVA (1972) 4 ERC 1850, 1861; City of New York v. United States, 337 F. Supp. 150, 160.)
".... .... .... .... ...
"(3) The parties before us are both public entities in litigation involving issues as to which the Legislature has declared, as previously noted, a clear and all encompassing public interest. In Arlington Coalition on Transportation, supra (458 F.2d 1323), the court had before it the application of NEPA relative to a freeway far advanced in its planning stages, with most of the acquisition costs expended. NEPA became effective January 1, 1970, and the action involving its requirement of an impact report was filed February 19, 1971. Defendants urged laches as a defense, but the federal court rejected such contention, ... We find no less strong the explicit legislative expression of public interest in CEQA."
The court did not hold that the doctrine of laches could not apply in County of Inyo, supra, but the situation there was quite different than that which confronts us here. The defendant asserting the defense was the City of Los Angeles, a municipal corporation with proprietary interests not shared by the citizens of the state in general.
*527 In People v. Department of Housing and Community Development, supra, there is further discussion of the role of the defense of laches in environmental litigation. After noting the policy of holding the government to a "standard of `rectangular rectitude' in dealing with its citizens," as the foundation for the doctrine permitting estoppel to be asserted against the government, the court said (45 Cal. App.3d at p. 196): "In lawsuits supporting environmental legislation, an opposing policy is aroused. The strong public interest in ecology preservation has prompted both federal and state courts to reject assertions of laches. (First National Bank of Chicago v. Richardson (7th Cir.1973) 484 F.2d 1369, 1372; Arlington Coalition on Transportation v. Volpe (4th Cir.1972) 458 F.2d 1323, 1329-1330, cert. den., sub. nom. Fugate v. Arlington Coalition (1972) 409 U.S. 1000 [34 L.Ed.2d 261, 93 S.Ct. 312]; County of Inyo v. Yorty, supra, 32 Cal. App.3d at pp. 812-813; cf. Concerned Citizens of Palm Desert, Inc., v. Board of Supervisors, supra, 38 Cal. App.3d at pp. 265-266.) ... Rejection of laches in environmental suits is consistent with the general principle that equitable defenses will rarely be invoked to defeat a policy adopted for the public protection. (City of Long Beach v. Mansell (1970) 3 Cal.3d 462, 493-494 [91 Cal. Rptr. 23, 476 P.2d 423]; County of San Diego v. Cal. Water etc. Co. (1947) 30 Cal.2d 817, 826 [186 P.2d 124, 175 A.L.R. 747].)"
Several federal cases have considered the applicability of the defense of laches in environmental litigation; almost all of them have rejected it. (See Arlington Coalition on Transportation v. Volpe, supra, 458 F.2d at pp. 1329-1330; Environmental Law Fund v. Volpe (N.D.Cal. 1972) 340 F. Supp. 1328, 1336, fn. 21; River v. Richmond Metropolitan Authority (E.D.Va. 1973) 359 F. Supp. 611, 628.) The lone federal case sustaining the defense, where the alignment of parties was comparable to that involved here, is Centerview/Glen Avalon Homeowners Ass'n v. Brinegar (C.D.Cal. 1973) 367 F. Supp. 633. In that case property owners trying to halt construction of an ongoing freeway project were held barred by laches as a result of "substantial expenditures of public funds" in reliance upon their unreasonable delay in asserting noncompliance with the environmental impact statement requirement of NEPA and the public hearing requirements of the Federal Highway Act. After holding that plaintiffs' delay had been unreasonable and that the substantial expenditures had been made in detrimental reliance upon their failure to file any legal action to enforce "the procedural requirements of the statutes in question," the court stated (367 F. Supp. at p. 640): "Said prejudice is not outweighed by any public consideration to the contrary, the Court noting particularly that the provisions of the statutes sought to *528 be enforced are procedural in nature and, if enforced, would not necessarily result in any change in the freeway project other than delay in its construction."
Whether or not the court's assessment of the environmental impact statement requirement of NEPA is correct under federal case law (which seems highly questionable), it certainly does not reflect the view of the courts of this state with respect to the EIR requirement imposed by CEQA. The significance of this decision, however, upon which respondent relies, is that it points up the real question which is posed by the assertion of the defense of laches in an environmental case such as this in which the sole interest required to be given consideration is that of the People of the State of California. That question is whether any prejudice has been shown to result from the delay which prejudice outweighs "any public consideration to the contrary."
Some of the public considerations which must be outweighed before a state agency's failure to proceed in accordance with requirements of law as stated in CEQA may be excused have already been enumerated. They include the "general public policy in requiring public officials to obey statutes" and the "all-encompassing public interest" in preserving the environment. (County of Inyo v. Yorty, supra, 32 Cal. App.3d at p. 813.) Equally significant, however, are other objectives embodied in CEQA. The EIR requirement, which as heretofore noted is the "heart" of CEQA, serves not only to protect our environment but as well to demonstrate to the public that it is being protected. As our Supreme Court said in No Oil, Inc. v. City of Los Angeles, supra, 13 Cal.3d at page 86: "One major purpose of an EIR is to inform other government agencies, and the public generally, of the environmental impact of a proposed project (see County of Inyo v. Yorty, supra, 32 Cal. App.3d 795, 810; Environmental Defense Fund, Inc. v. Coastside County Water Dist., supra, 27 Cal. App.3d 695, 704-705; cf. Jones v. District of Columbia Redevelopment Land Agcy. (D.C. Cir.1974) 499 F.2d 502, 511 [NEPA]), and to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action."
Another significant aspect of the EIR requirement is stated in People v. County of Kern, 39 Cal. App.3d 830, 842 [115 Cal. Rptr. 67]: "Only by requiring the County to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided, and only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials, thus *529 allowing for appropriate action come election day should a majority of the voters disagree."
Though economy in government is an important consideration, the Legislature has clearly subordinated it to environmental considerations by adopting CEQA. Substantial dissipation (nonproductive expenditure) of public funds may result if compliance with the EIR requirement causes abandonment of the project, even though there would be a net reduction in outlay by the elimination of the construction cost of approximately $10 million. We cannot, however, conceive how environmental considerations which would compel such abandonment could be weighed against, much less outweighed by, any such dissipation of funds. On the other hand, if the result of compliance with the requirements of CEQA is that the project ultimately proceeds substantially as now constituted, the only element of financial detriment which would remain is the claimed increase in the cost of construction by loss of a favorable bid. The stay already issued by this court makes that loss unavoidable. It could not, in any event, outweigh the substantial benefits inherent "in requiring public officials to obey statutes," in demonstrating "to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action," and enabling the public "to determine the environmental and economic values of their elected and appointed officials."
(7) We have not in this connection ignored the court's purported findings that all possible adverse environmental effects of the project have already been fully considered and minimized by respondent and that: "28. If a full environmental impact report were to be required for this project, there is substantially no chance that, as a result of that study, the project would be altered in its basic concept or in any significant detail, or abandoned." These findings relate to a matter into which the court was not authorized to inquire and which, without prescience, it could in no event determine, even if so authorized. CEQA requires that the determination whether the project shall be altered or abandoned be made by respondent Division of Highways after the results of full environmental research are embodied in an environmental impact report and there has been an opportunity for input from the public and from other agencies.[21] When that has been done, the sole function of the courts will be to review it to determine if it is "supported by substantial evidence." (Pub. Resources Code, § 21168.5.)
*530 (5c) We conclude, therefore, that the record in this case does not support a defense of laches against appellants.
What has heretofore been said requires reversal of the judgment and the entry of a judgment in favor of appellants, annulling respondent's determination to proceed with the Lompoc Bypass Project without compliance with the EIR requirement set forth in sections 21100 and 21102 of the Public Resources Code and enjoining any further proceedings to carry out said project unless and until such action is taken in accordance with the requirements of law.
In view of this disposition, we find it unnecessary to deal with numerous contentions raised by appellants based upon the requirements of NEPA and the Federal Highway Act. We also deem it inappropriate to resolve disputes concerning the scope of the environmental impact study, and the EIR which shall be undertaken; that is, whether it should include both the Harris Grade Freeway and the Lompoc Bypass, or simply the latter. We suggest, however, that future litigation of this nature can best be avoided by resolving all doubts in favor of affording fullest protection to environmental considerations.
We likewise find it inappropriate to decide issues raised by appellants Bosio and Gherini concerning the propriety of respondent proceeding with the condemnation of their property until it has been determined that the Lompoc Bypass Project shall be carried out. We have no appeal before us from any determination of the condemnation aspect of the litigation between them and respondent. Furthermore, there is nothing whatever in the record to suggest that respondent's own self-interest will not continue to dictate that said action remain in abeyance until the future of the project is finally determined.

This Court is Unable to Award Attorneys Fees to Appellants
(8) The trial court denied appellants' applications for attorneys' fees as "private attorneys general." No doubt this denial was at least in part based upon the fact that it decided the case against appellants. The application has been renewed before this court. In this court appellants have been successful in their objective of enforcing important environmental law. The question posed by the application to this court is at this juncture very similar to that which the Supreme Court dealt with in the modification of its opinion in Bozung v. Local Agency Formation Commission, 13 Cal.3d 483, 484-485 [119 Cal. Rptr. 215, 531 P.2d 783]:
*531 "After we filed our opinion in this case plaintiffs made a motion for an award of reasonable attorneys fees incurred in connection with the appeal, to be assessed against defendant Local Agency Formation Commission of Ventura County and defendant City of Camarillo, on the following stated grounds: `(1) Respondent Ventura County Local Agency Formation Commission and the citizens of the County and respondent City of Camarillo and its citizens were substantially benefitted by Appellants' successful appeal; and (2) Appellants, without hope of monetary recovery, acted as private attorneys general and successfully carried the extremely difficult and heavy burden of enforcing important environmental laws violated by Respondents.'
"This motion raises questions of law which have not been decided in this state (see D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 24-27 [112 Cal. Rptr. 786, 520 P.2d 10]) and which we could not properly decide without full briefing and opportunity for oral argument. Moreover, since our jurisdiction to rule on the motion may arguably be dependent on continuing jurisdiction over the appeal, we would be compelled to grant a rehearing in this case to afford time adequately to rule on the merits of the motion and at the same time insure our jurisdiction to do so. Finally we note that a motion for attorneys fees raises issues of fact both as to the underlying circumstances that may give rise to the right to fees and as to the amount thereof if such right is found to exist.
"In view of the foregoing considerations we conclude that plaintiffs' motion should properly be addressed to the trial court, whose ruling thereon may thereafter be reviewed on appeal, and that to avoid delaying finality of our judgment on the merits of the appeal we should not at this time express any opinion on the legal issues presented by plaintiffs' motion with respect to whether or not there may be an award of attorneys fees in this sort of litigation.
"Accordingly, plaintiffs' motion for an award of attorneys fees is denied without prejudice to their right to make a similar motion in the trial court. In the event that such a motion is made, the superior court is ordered to hear and determine it, and if it concludes that plaintiffs are entitled to a reasonable attorneys fee for services performed on appeal to be assessed against defendants, to fix the amount thereof. (See American City Bank v. Zetlen (1969) 272 Cal. App.2d 65, 67 [76 Cal. Rptr. 898].) The clerk is directed to incorporate the foregoing orders in the remittitur to be issued in Bozung v. Local Agency Formation Com., L.A. 30307 (ante, *532 p. 263 [118 Cal. Rptr. 249, 529 P.2d 1017]), and to include therewith a certified copy of this opinion."
The same considerations dictate that this court handle the matter in the same fashion. In view of the Supreme Court's statement that questions are raised "which have not been decided in this state" (citing D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 24-27 [112 Cal. Rptr. 786, 520 P.2d 10]), an attempt by this court to resolve those questions might well delay finality of this court's determination of the merits of this case by requiring the granting of a hearing in the Supreme Court. It is important that our determination of the merits not be so delayed. Furthermore, like the Supreme Court, we lack the necessary factual showing required to fix the amount of the fee that would be reasonable. Accordingly, we deny the motion without prejudice to appellants' right to make a similar motion in the trial court, to include services performed on appeal.
The judgment is reversed and the cause is remanded to the trial court with directions to enter a judgment in favor of appellants and against respondent, annulling respondent's determination to proceed with the Lompoc Bypass Project without compliance with the EIR requirements set forth in sections 21100 and 21102 of the Public Resources Code, and enjoining any further proceedings to carry out said project until respondent complies with the requirements of the California Environmental Quality Act applicable thereto.
Cobey, Acting P.J., and Allport, J., concurred.
NOTES
[1] PLUS is an unincorporated association of individuals residing in the vicinity of Lompoc. When formed in 1970, it had 50 to 100 members.
[2] Homeowners Security Alliance is an unincorporated association of homeowners and residents living primarily in a residential section of the City of Lompoc which was closely adjacent to the proposed freeway. This group was formally organized in June 1973.
[3] Bosio v. Superior Court, 36 Cal. App.3d 586 [111 Cal. Rptr. 789].
[4] The correctness of this finding is hardly open to dispute. The manner of construction of the freeway involved land cuts up to 300 feet in depth at the southern end and lesser, but substantial, cuts at the northern end to produce material with which to raise the level of the roadbed above the valley floor because of the past flooding history of the Santa Ynez River. The bridging of that river with consequent impediment to its flow in the immediate vicinity of the City of Lompoc was required, and air and noise pollution was threatened in a residential district. Highway No. 1, which was classified as a scenic highway under Streets and Highways Code section 263.2, was made more suitable for through traffic to the north of its intersection with Highway No. 101 at Las Cruces.
[5] In view of the disposition hereinafter made, the correctness of this conclusion does not require determination.
[6] As will hereinafter appear, in view of our disposition of contention (1), it is unnecessary to deal with appellants' contentions (2) and (3).
[7] Streets and Highways Code sections 183 (as then in effect) and 75 read as follows:

"All money available for the acquisition of real property or interests therein for state highways, or for the construction, maintenance or improvement of state highways or highways in state parks shall be deposited in the State Highway Fund. The moneys in said fund are appropriated and shall be allocated and expended for the purposes and in the manner provided in this code." (§ 183.) (Effective July 1, 1973, the words "or highways in state parks" were deleted. This change is not relevant to this appeal.)
"Except as otherwise provided by law, the commission at any time and from time to time may:
"(a) Select, adopt, and determine the location for state highways on routes authorized by law.
"(b) Allocate, from the funds available therefor, moneys for the construction, improvement or maintenance of the various highways or portions thereof under the jurisdiction of the department. The commission may determine in each case the maximum sum of money that shall be made available therefor.
"(c) Authorize preliminary surveys to determine the advisability of including in or excluding from the State Highway System any highway or portion thereof." (§ 75.)
[8] Each of these sections has subsequently been amended in respects not relevant to this appeal. Section 21100 was amended in 1972 to make it clear that the environmental impact report requirement was applicable regardless of whether there was any other report in which to include it. This, however, did not change the meaning of the section since it had already been so construed by our Supreme Court in Friends of Mammoth v. Board of Supervisors, 8 Cal.3d 247, 266 [104 Cal. Rptr. 761, 502 P.2d 1049].

Section 21102 was also amended in 1972 to enlarge the exemption of projects "involving only planning" to embrace "feasibility or planning studies for possible future actions" not being approved or funded.
[9] Though conceivably a situation could be presented where the remaining funds required were so insubstantial that no purpose of CEQA would be served, such a situation is not presented in this case.
[10] As heretofore noted, funds in the State Highway Fund are "appropriated" by Streets and Highways Code section 183, not by the Budget Act.
[11] Public Resources Code section 21166 reads as follows:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent environmental impact report shall be required unless either of the following occurs:
"(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.
"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report."
[12] As explained in the opinion, "P.S. & E. approval" meant approval of "surveys, plans, specifications, and estimates."
[13] The pertinent portion of the text of Circular Letter No. 71-7 is as follows:

"Application. Either an Environmental Statement or Negative Declaration will be required on all projects unless regular right-of-way funds (i.e. capital outlay funds exclusive of hardship and protection funds) or construction funds were budgeted for the project prior to November 23, 1970. Major projects (projects on new location or major reconstruction projects on adopted routes) that have advanced beyond the regular right-of-way funding stage must be reviewed to determine if the proposed design minimizes adverse environmental consequences and to examine the highway planning to insure that its environmental consequences were thoroughly considered. Such projects, to the extent practical, should be modified to incorporate additional elements or features identified and considered prudent to minimize environmental harm. This review will be made by appropriate Headquarters and District personnel and representatives of the FHWA. After the review, a determination will be made on the need for Environmental Statements for projects in this category."
[14] The pertinent portion of the text of this interim guideline was as follows:

"4. APPLICATION OF ENVIRONMENTAL QUALITY ACT TO ONGOING PROJECTS
"a. Projects for which initial funding has been approved and on which construction has been initiated prior to the effective date of the Act, November 23, 1970, shall not require an environmental statement unless major modifications which significantly change the original authorized project are proposed.
"b. All state departments, boards and commissions, through their agencies, shall develop criteria to determine whether or not environmental impact statements will be required for projects funded but on which construction has not yet been initiated prior to the effective date of the Act, November 23, 1970. These criteria shall be transmitted to the State Office of Planning and Research for review and comment."
[15] Section 15070 of title 14 of the California Administrative Code reads as follows:

"(a) A project as defined in Section 15037 (a)(1) of these Guidelines, approved prior to November 23, 1970, shall require an Environmental Impact Report or a Negative Declaration if the project may have a significant effect on the environment, and either of the following conditions exists:
"(1) A substantial portion of public funds allocated for the project have not been spent and it is still feasible to modify the project to mitigate potentially adverse environmental effects, or to choose feasible alternatives to the project, including the alternative of `no project' or halting the project; provided that this Section (1) shall not apply to projects which come under the jurisdiction of the National Environmental Policy Act (NEPA) and which, through regulations promulgated under NEPA, were held to be too far advanced at the time of NEPA's effective date to require an EIS in compliance with those regulations.
"(2) A public agency proposes to modify the project in such a way that the project might have a new significant effect on the environment."
[16] Section 21172.5 provides:

"Until the 121st day after the effective date of this section, any objectives, criteria and procedures adopted by public agencies in compliance with this division shall govern the evaluation of projects defined in subdivisions (a) and (b) of Section 21065 and the preparation of environmental impact reports on such projects when required by this division.
"Any environmental impact report which has been completed or on which substantial work has been performed on or before the 121st day after the effective date of this section, if otherwise legally sufficient, shall, when completed, be deemed to be in compliance with this division and no further environmental impact report shall be required except as provided in Section 21166."
[17] This distinction is manifested in the California Administrative Code: chapter 3 of title 14 of the California Administrative Code is broken down into 11 articles, article 6 of which is headed "Application of the Act to Projects" and article 7 is headed "Evaluating Projects."
[18] Section 21082 of the Public Resources Code reads as follows:

"All public agencies shall adopt by ordinance, resolution, rule or regulation, objectives, criteria and procedures for the evaluation of projects and the preparation of environmental impact reports pursuant to this division. The objectives, criteria and procedures shall be consistent with the provisions of this division and with the guidelines adopted by the Secretary of the Resources Agency pursuant to Section 21083. Such objectives, criteria and procedures shall be adopted by each public agency no later than 60 days after the Secretary of the Resources Agency has adopted guidelines pursuant to Section 21083."
[19] These findings read as follows:

"30. As of the date of trial herein, the State had expended or deposited as security for possession $1,913,000.00 for right-of-way for the freeway.
"31. Of the total of 257 acres required for right-of-way, all but 79 acres have been acquired and the remaining 79 acres are subject to orders of immediate possession.
"32. The State has entered into contracts with public utilities and pipeline companies for the relocation of their facilities in connection with the freeway project, and this work is in progress, having commenced in 1973.
"33. Advertising for bids on the construction contract was completed on June 5, 1973. Bids were opened on June 20, 1973. The low bid, that of Granite Construction Company, was $350,000.00 below the State's estimated cost of construction. If that bid were not accepted soon after August 13, 1973, it would be withdrawn.
"34. If the project is halted and the low bid is lost, the State will sustain a direct monetary loss of between $700,000.00 and $1,000,000.00."
[20] The request for special findings by appellants Bosio and Gherini was in the following language:

"3. If the Court should find unreasonable delay in raising the environmental issue by the defendant/cross-complainant, when did the delay occur, and if the Court should find prejudice caused by this delay, the specific prejudice which the Court finds, and the date when the State began suffering from this prejudice."
[21] Friends of Mammoth v. Board of Supervisors, supra, 8 Cal.3d at page 263, footnote 8; Russian Hill Improvement Assn. v. Board of Permit Appeals, 44 Cal. App.3d 158, 167 [118 Cal. Rptr. 490].